70 So.3d 885 (2011)
Peter BECKER, Jr., Stanley Jones, Robert Krysan, and Melvin Stipelocovich
v.
MURPHY OIL CORPORATION.
No. 2010-CA-1519.
Court of Appeal of Louisiana, Fourth Circuit.
June 2, 2011.
Rehearing Denied July 7, 2011.
*887 J. Wayne Mumphrey, Clayton M. Connors, Mumphrey Law Firm, LLC, New Orleans, LA, J. Burton LeBlanc IV, Baron and Budd, P.C., Baton Rouge, LA, for Plaintiffs/Appellees.
James M. Garner, Debra J. Fischman, Christopher T. Chocheles, Sher Garner Cahill Richter Klein & Hilbert, L.L.C., New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge CHARLES R. JONES, Judge MAX N. TOBIAS, JR., Judge ROLAND L. BELSOME).
ROLAND L. BELSOME, Judge.
Plaintiffs-Appellees Peter Becker, Jr., Joseph Barcia, Marvin Baudean, Salvador DiCarlo, Ronald Gilmore and Roy Phillips[1] alleged that as a result of long-term occupational noise exposure at the Murphy Oil Meraux refinery, they suffered hearing loss. After a bench trial, the court awarded each plaintiff except Ronald Gilmore $50,000.00[2] in damages in a judgment dated March 22, 2010.[3] With respect to Ronald Gilmore's claims, the trial court found in favor of Defendant-Appellant, Murphy Oil Corporation (now known as Murphy Oil USA Inc.), and dismissed his claims with prejudice.
Murphy subsequently filed a Motion for New Trial for Judicial Interest Calculation, which the trial court granted on July 22, 2010.[4] Mr. Gilmore also filed a Motion for New Trial, which the trial court granted, severing both Mr. Gilmore's case and new trial from that of the other plaintiffs. Murphy appeals the judgment awarding damages to Peter Becker, Jr., Joseph Barcia, Marvin Baudean, Salvador DiCarlo, and Roy Phillips. For the reasons that follow, we affirm the trial court's judgment.

REASONS FOR JUDGMENT
The trial court articulated its factual findings with respect to each plaintiff; *888 Murphy's exception of prescription; Murphy's liability to its employees with respect to noise exposure; and its award of damages in its detailed written reasons for judgment. We summarize these factual findings below.

Joseph Barcia
A seventy-year-old man, Mr. Barcia worked at Murphy for twenty-five years, from 1961 until he retired in 1986 at fifty-six years of age. The trial court found that Mr. Barcia was exposed to loud noise as a laboratory assistant and operator for twenty-one years and as a foreman for the last four years. Mr. Barcia worked in the CAT unit and boilers; he did not wear hearing protection, nor did Mr. Barcia observe anyone else wearing hearing protection. The trial court also recognized that Mr. Barcia saw no signs or materials requiring hearing protection; nor was he told to wear them, nor was hearing protection discussed. Likewise, as a foreman, he was never required to tell his workers that hearing protection was mandatory. The trial court noted that Mr. Barcia first saw earplugs in 1985.
Mr. Barcia did not notice his hearing loss. Although he wore a hearing aid from 1986 until 2005, he did not suspect his work at Murphy to have caused the need for a hearing aid. Prior to working for Murphy, Mr. Barcia fired a rifle approximately six times while in boot camp for the Air Force, and fired a shotgun once while hunting. He also joined the National Guard for six years, where he worked as a butcher. Mr. Barcia subsequently worked for Flintkote as an inspector, but the trial court acknowledged that there was not much noise exposure at Flintkote.
Dr. Moises Arriaga, an expert in neuro-otology, conducted a physical examination of each plaintiff, which included taking the medical history and an audiogram[5] of each. Dr. Arriaga also reviewed each plaintiff's deposition and the noise exposure evidence produced by Murphy.
The trial court recognized that Dr. Arriaga diagnosed Mr. Barcia with mild to severe bilateral sensorineural[6] high frequency *889 hearing loss with a "notch" on the left side, and concluded that his employment with Murphy was the most significant contributing factor;[7] accordingly, Dr. Arriaga found that his prior employment, family history and military service were not significant contributors to his hearing loss.[8] Additionally, Mr. Barcia's age was not a factor, as he retired at fifty-six years of age and after developing hearing loss. The trial court acknowledged Dr. Arriaga's finding that Mr. Barcia reported a plugged and ringing feeling in his ear after a work shift indicating noise loud enough to bruise the inner ear called a temporary threshold shift[9] which, repeated enough, could become a permanent hearing loss.[10]

Marvin Baudean
A seventy-three year old man, Mr. Baudean worked at Murphy for thirty-one years as a welder, from 1967 until his retirement in 1998 at sixty-one years of age. The trial court determined that Mr. Baudean was never advised to wear hearing protection, but wore earplugs in the late 1980s on his own because of the high noise levels. Mr. Baudean had hearing tests in the 1970s and on approximately *890 five to six occasions thereafter, but was not advised of the test results.[11] His hearing loss was also gradual.
Mr. Baudean was in the Marine Corps for two years, and fired a rifle on one trip to a rifle range during basic training. After discharge from the Marines, he worked for American Marine as a welder for four to five years, and also performed temporary work as a pipefitter; however, Mr. Baudean indicated that neither of the premises was particularly noisy.
Dr. Arriaga diagnosed Mr. Baudean with mild to moderately severe bilateral sensorineural high frequency hearing loss, and found that Murphy was the most significant contributing factor. In 1994, an audiogram showed normal hearing at low frequencies, but high frequency hearing loss with a "notch" in both ears. Dr. Arriaga noted that Mr. Baudean reported "a temporary noise shift, being the feeling of ears clogged and ringing for a duration to bruise the inner ear." Dr. Arriaga did not consider age to be a contributing factor because of the progression of the hearing loss; likewise, he did not consider a chemotherapy regime that began in 1999 to have contributed to his hearing loss because it was after his retirement in 1998.[12] Dr. Arriaga also testified that he did not consider Mr. Baudean's military training to be a significant contributing factor.[13]

Peter Becker, Jr.
Mr. Becker worked at Murphy for thirty-five years, from 1961 until his retirement in 1996. Mr. Becker generally worked in operations, and occasionally in the boiler house and CAT. The trial court acknowledged Mr. Becker's testimony that both the boiler house and the CAT were extremely noisy. Mr. Becker wore no hearing protection, nor did his co-worker, Bill Turnage, who ultimately became the safety director. No signs were posted which advised wearing hearing protection, nor was he ever advised to do so. Likewise, during the four years preceding his retirement, there were discussions regarding hearing protection.
In 1972, Mr. Becker was advised he was suffering hearing loss; however, he did not relate it to Murphy, but instead he related it to growing older. He was tested for the *891 loss, and was advised each time that his hearing was progressively getting worse. Other than those comments, Mr. Becker never saw any reports, documents or test results related to his hearing tests. He wore hearing aids after Hurricane Katrina, over ten years after his retirement. The trial court acknowledged that Mr. Becker fired a weapon during basic training for the Air Force, where he worked in the maternity ward of a hospital.[14] After discharge, he worked for ODECO as a roustabout, Freeport South, and Amax Nickel, none of which were noisy. Mr. Becker was subsequently hired at Ingram Oil (the predecessor to Murphy Oil).
Dr. Arriaga diagnosed Mr. Becker with bilateral sensorineural high frequency hearing loss, which he determined was more likely than not caused by occupational noise exposure at Murphy.[15] Dr. Arriaga did not find personal or medical history[16] or age to be a contributing factor in Mr. Becker's hearing loss.

Salvador DiCarlo
A seventy-six year old man, Mr. DiCarlo worked at Murphy for thirty-two years, with fifteen years in operations and seventeen years as an insulator, followed by work in maintenance until he retired in 1993 at the age of fifty-nine. Mr. DiCarlo recalled that Murphy provided earplugs in 1974, based upon what he was told at the time. Mr. DiCarlo did not receive instructions with regard to the use of earplugs, nor did he recall seeing signs indicating high noise areas or suggesting that noise protection should be used.
Mr. DiCarlo testified that he "already noticed a hearing loss" in 1974, stating "Yes, yes, I couldn't help but lose my hearing with all that noise around there. *892 Especially when I worked around the boilers." However, the trial court specifically noted that audiograms were conducted by Murphy in 1974, 1976, and 1981 which indicate that Mr. DiCarlo felt his hearing was "good" on each occasion. Mr. DiCarlo fired a rifle in basic training for the military, and became a company clerk shortly thereafter. He subsequently worked for Amax Nickel and Freeport, neither of which were as noisy as Murphy, according to his testimony. He smoked for twenty-two years and did little hunting or fishing.
Dr. Arriaga diagnosed Mr. DiCarlo with severe bilateral sensorineural high frequency hearing loss and concluded that his work at Murphy was the most significant contributing factor;[17] accordingly, medical history, family history, previous work history and age[18] were not significant contributing factors to Mr. DiCarlo's hearing loss.

Roy Phillips
A sixty-eight year old man, Mr. Phillips worked for Murphy from 1974 until his retirement in 2003, as an operator and pipefitter. The trial court found that in 1974, his hearing was tested and "hearing good" was indicated in the results. Hearing protection was not discussed or recommended, nor were signs posted indicating high noise areas. The court noted that Mr. Phillips was not provided with earplugs until 1990, and hearing protection was not required until 2000; he wore earmuffs shortly before retiring. Mr. Phillips attended safety meetings, but none with regard to hearing protection. The results of his audiograms during his employment were not discussed with him.
Dr. Arriaga diagnosed Mr. Phillips with severely impaired sensorineural hearing *893 loss on both sides, with the right side more severe and the left side more typical of high frequency hearing loss caused by occupational exposure. Dr. Arriaga did not attribute any other factors as significant contributors to Mr. Phillips' hearing loss.[19]

Prescription
The trial court acknowledged Murphy's argument that the Plaintiffs were aware that they were exposed to loud noise at the refinery and thus had knowledge of their injury for more than one year before filing suit. The court noted, however, that hearing loss is "gradual and insidious"[20] and *894 that the Plaintiffs simply attributed the hearing loss to a natural part of the aging process.
Additionally, the court recognized that hearing loss, an occupational disease caused by exposure to loud noise in the workplace over many years, is a long latency disease, citing Bath Iron Works Corp. v. Director, Office of Workers' Compensation Programs, 506 U.S. 153, 163, 113 S.Ct. 692, 698, 121 L.Ed.2d 619 (1993), and Cole v. Celotex Corp., 599 So.2d 1058 (La.1992). The court referenced the work history of the Plaintiffs, acknowledging that most worked at Murphy for over twenty-five years, and some over thirty years, and that each Plaintiff came to work there as a young man and left only after retirement. The court found that the evidence did not demonstrate that the Plaintiffs "had any particular skills, expertise, experience or intellect to discern the cause and relationship of their hearing loss with their employment, nor to segregate and evaluate the contribution of the myriad of potential causes of hearing loss."
The trial court further noted that although the Occupational Health and Safety Act ("OSHA") mandated hearing protection and conservation programs in 1971, by 1974, "the only face of hearing plugs was their reputed availability in the nurse[s'] station" and that "[o]thers date ear plug availability in mid-to-late 1980's, a decade after they were required by amendments to OSHA regulations." Likewise, with regard to hearing tests or audiograms, the trial court found that such tests were "sporadic" and that employees were typically not informed of the results of such testing; when employees were informed of the results, "the potential cause or precautions were never articulated to include noise exposure at the workplace, which was carefully and conspicuously omitted." Although Murphy argued that hearing loss cannot be attributed to workplace noise exposure without audiograms, the court noted that "OSHA is abundantly clear in that Murphy bears the responsibility for having those audiograms done on their employees."
Accordingly, the court found that the doctrine of contra non valentem applied, refusing to allow Murphy to "close the courthouse door to Plaintiffs ... because they knew or should have known the cause of their hearing loss was the exposure to occupational noise during their work lifetime."[21] The court recognized that contra non valentem was particularly appropriate for long latency occupational diseases, citing Broussard v. Union Pacific Railroad Company, 29,769, p. 2 (La.App. 2 Cir. 8/28/97), 700 So.2d 542, 544, wherein the court found that an action for hearing loss, which develops over a substantial period of time, "cannot accrue ... until [the] injury has fully evolved."
Finally, with regard to Murphy's argument that Mr. DiCarlo's testimony established his knowledge of his hearing loss as early as 1974, the court noted that the evidence at trial demonstrated that Mr. DiCarlo was assessed with "good hearing" on several occasions later than 1974, and that a single utterance should not be cause to reject his claim on prescription grounds, "particularly when at odds with the remaining evidence."[22]

*895 Noise Exposure
The trial court summarized the evidence presented at trial with respect to the Plaintiffs' noise exposure at Murphy. The court noted that Murphy began conducting the noise level surveys in 1980, which the Plaintiffs' expert acoustical engineer reviewed and concluded that the noise levels reflected in the surveys were unsafe. In 1981, Murphy identified four areas of the refinery as major noise sources but declined to take action for economic reasons. The trial court noted that in 1983, 1984, and 1988, the highest sound levels exceeded 100 decibels and that noise levels exceeded 85 dBA[23] "even in the break area." A report prepared by USF & G in 1988 was also introduced at trial; the court noted that the report recommended the use of hearing protection inside the refinery based on maximum sound levels of 105 to 135 decibels, and a repeat study in 1989 found "Meraux's latest dosimeter testing resulted in readings for many employees over the 90 dBA level." (emphasis added).
Next, the court acknowledged the disagreement between Murphy's expert and the Plaintiffs' expert with regard to the average daily noise exposure during Plaintiffs' employment with Murphy, noting that Murphy's expert relied upon post-1988 sound surveys and his experience in other refineries. The court reiterated OSHA's mandate that Murphy conduct noise surveys, finding that "[t]he sound surveys compiled prior to 1988 by Murphy as part of their hearing program cannot simply be rejected by their author, discarded and replaced with time-decades removed dosimetry substituted through surmise, even from Murphy's retained expert."
The trial court rejected Murphy's argument that Plaintiffs failed to establish a requisite "dose" noise level, as well as Murphy's attempt to analogize the facts to cases involving toxic exposure to mold, ethylene oxide, and asbestos, finding that "[w]hile sounds or loud noises are capable of measurement, they are varying and fugitive, and not substances akin to those in the cases relied upon by [Murphy] and, consequently, are not controlling as precedent." Similarly, the court also rejected Murphy's argument that noise exposures below federally regulated levels failed to show a breach of duty and thus no negligence, citing Broussard, supra, wherein a railroad employee brought a hearing loss claim against his employer "without reference to the federal standard of noise exposure or [] proving the precise level of decibel noise in the workplace."
The basis for rejecting Murphy's claim was the court's determination that 1) OSHA regulations do not operate as a foundation for tort-based negligence from hearing loss resulting from long term occupational noise exposure; and 2) "sources within scientific organizations concerned with hearing loss from occupational exposure to loud noises have long recommended an eight-hour work day limit be lowered to 85 dBA,"[24] which is the "action *896 level" for hearing conservation programs pursuant to 29 C.F.R.1910.95.
The court concluded that, contrary to Murphy's assertions, the cases of Joy Mining Machinery v. Workers' Compensation Appeal Board, 805 A.2d 1279 (Penn.2002) and McCuiston v. Addressograph-Multigraph Corp., 308 N.C. 665, 303 S.E.2d 795 (1983) did not stand for the proposition that noise exposures at or below 90 dBA were "safe"; nor were the cases analogous, as both involved workers' compensation actions for benefits under the respective workers' compensation laws, and were thus inapplicable for tort based premises liability or negligence actions. Additionally, the court noted that the workers' compensation laws in Joy Mining and McCuiston did not establish a sound level for entitlement to benefits, but allowed an employer to raise the affirmative defense that noise levels did not exceed 90 dBA on an eight-hour time weighted average. Lastly, the trial court acknowledged that in this case, many employees worked much longer than eight-hour days, often times working as many as twelve hours or more in overtime or during turnarounds; thus, the level of noise exposure to an employee increased accordingly.

Liability
Turning to the issue of liability, the court found that the Plaintiffs had established causation for their hearing loss claims against Murphy. The court first noted that "upon 1989 amendment to our Work[ers'] Compensation Act, only permanent hearing loss solely due to a single traumatic accident is compensable as a permanent total disability." Thus, the trial court determined that an employee may bring a tort claim against his employer for gradual hearing loss due to occupational noise exposure because such an injury is not compensable under the LWCA.[25]
Next, pursuant to a duty-risk analysis, the trial court concluded that Murphy was negligent by failing to provide the Plaintiff employees a safe place to work and failing to take precautions to avoid noise exposure. Citing 29 C.F.R. § 1910.95, the court noted that OSHA mandates hearing conservation programs beginning at noise exposure of 85 dBA. Additionally, the court acknowledged that this "action level" by OSHA requires monitoring by the employer; that the employer establish and maintain an audiometric testing program with baseline audiograms within six months after an exposure to above 85 dBA; an evaluation of the audiogram; and follow-up procedures, including referral to a clinical audiological examination or ontological examination, advisement of threshold shifts, a requirement to provide hearing protectors in all areas of noise above 85 dBA, and a requirement to provide a training program for each employee exposed above 85 dBA. The training program would instruct the employee with regard to the use and selection of hearing protection.
The court also reiterated the Plaintiffs' testimony that availability of ear plugs was only "on a come and get them if you want them" basis and that signs requiring the use of hearing protection was "intermittent, if at all, in some of the designated high noise areas." The court further found that the use of audiograms was "sporadic" and remarked that "never was a baseline audiogram done timely, if at all." The court also found it noteworthy *897 that the Plaintiffs were not informed of the results of the tests, nor advised of any potential causal relationship.
Additionally, the trial court made the following findings with regard to Murphy's actions (emphasis supplied by trial court):
Murphy Oil Corporation chose to designate certain specific areas of the refinery where the wearing of hearing protection was mandatory in [1]974 (that is in excess of 85dBA). Yet Murphy did not take sound measurements until 1980. The belated requirement of wearing hearing protection such as ear plugs or muffs in cer[tain] areas is indicative of a realization that the unprotected noise levels in that area would be hazardous. In 1988, the USF & G study recommended mandatory hearing protection be expanded to [ ] all of [its] employees within the perimeter of the refinery equipment. Even though specific areas were specifically designated for the use of hearing protection, initially in and expanded after 1988, there has not been a scintilla of evidence or even notation made or concern expressed by Murphy Oil Corporation that its directive of hearing protection being mandatory was ever enforced even by gentle persuasion, other than the mere designation as mandatory. Bill Turnage, Murphy's Safety Manager, noted in a 1990 safety audit that [the] safety program [was] "ineffective" and that they had made some "tragic mistakes," that "communication of safety issues are weak," and "the use of hearing protection is not always enforced."
The only safety audit was not responded to until four (4) years later. In 1980, an internal Murphy Oil memorandum stated, "we've got a problem with our supervisors understanding safety." This declaration critiquing the effectiveness of Murphy's hearing safety program well may rank among all gross understatements, in light of the evidence.
Murphy's corporate decisions seem to [have] ranked economic frugality over hearing protection when it was too expensive to spend $110,000.00 for noise control equipment in a $35,000,000.00 plant expansion in [the] late 1970's or to paint blue lines to designate a hearing hazard zone to indicate noise levels above 90 decibels.

Damages
In this case, the Plaintiffs stipulated to limit each of the general and special damages to not more than $50,000.00, exclusive of interest and costs. Both parties provided calculations of special or future medical expense losses:

 Plaintiffs' Murphy's
Name Calculations Calculations
Mr. Barcia $17,947.00 $ 9,216.33
Mr. Baudean $25,013.00 $13,223.98
Mr. Becker $17,947.00 $ 9,312.75
 (canal implant)
Mr. DiCarlo $24,747.00 $ 2,469.33
Mr. Phillips $18,101.00 $ 9,413.01

The trial court noted that the major difference between the Plaintiffs' calculations and Murphy's calculations was the use of the discount rate, with Plaintiffs using Treasury bills and Murphy using a different index. The court concluded that the use obligations of United States Treasury bills to index future cost was the appropriate and proper measure of future costs. Finally, the court found that "should it award the true value of general damages to Plaintiffs Phillips, Barcia and DiCarlo,[26] it would exceed in multiples the maximum amount this court *898 could award due to the ceiling on the stipulated amount." (Emphasis added). With respect to special and future medical damages, the court found that if it awarded "what it considers as a meager amount of general damages of fifty thousand ($50,000.00) dollars for [Phillips, Barcia, and DiCarlo] and added the special or future medical damage for each, it would exceed the stipulated or jurisdictional amount."
Similarly, with regard to Plaintiffs Baudean and Becker, the trial court found that an "equally meager award of thirty-five thousand ($35,000.00) [dollars] for general damages added to the special or future medical expenses would exceed the stipulated or jurisdictional amount of fifty thousand ($50,000.00) dollars." Accordingly, the trial court awarded each Plaintiff $50,000.00.

STANDARD OF REVIEW
Factual determinations are subject to the manifestly erroneous or clearly wrong standard of review. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Thus, the issue to be determined by this Court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. "Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." Id. (citing Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978)).
Accordingly, if the trial court's findings are reasonable considering the record in its entirety, "`the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Id. at 883 (citing Housley v. Cerise, 579 So.2d 973 (La.1991)(quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990))). This standard of review "is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Id. (quoting Canter v. Koehring Co., 283 So.2d 716 (La.1973)).

DISCUSSION

Assignments of Error # 1 and 2
In its first two assignments of error, Murphy argues that the trial court erred in excluding evidence of noise exposure at other refineries and in finding that the Plaintiffs' noise exposure at Murphy was the cause of the plaintiffs' hearing loss.
It is well-settled in Louisiana jurisprudence that an appellate court reviews a trial court's determinations with regard to the exclusion of expert evidence or testimony under the abuse of discretion standard. Versluis v. Gulf Coast Transit Co., 2008-0729, p. 6 (La.App. 4 Cir. 7/29/09), 17 So.3d 459, 463.
In rejecting Murphy's attempt to have its expert, Dr. Dennis Driscoll, testify with regard to noise exposure at the Tenneco refinery, the court stated:
I am not going to let you relate conditions at another facility, at another place, at another time, with varying pieces of equipment, with varying distances between the worker and the sound, and have them apply in this case, sir. Do I make that clear?
As the trial court acknowledged, the documentation from the Tenneco refinery resulted from sound readings at an entirely different refinery and was thus *899 properly excluded.[27] Murphy's reliance upon Ronald Gilmore and Vincent Vicidomina's testimony to demonstrate that the two facilities were sufficiently similar is misplaced. Mr. Gilmore's testimony that "all the refineries are noisy" and "[n]one of them are quiet" and Mr. Vicidomina's testimony that, during the only two occasions he visited the Tenneco refinery, the noise level was "comparable" is insufficient to provide a basis upon which to introduce sound level readings from a completely different facility, as neither Mr. Gilmore nor Mr. Vicidomina was an expert. Additionally, Dr. David Lipscomb, an expert in audiology, testified at trial that the level of noise exposure would differ between refineries due to the distance a particular employee was from a piece of equipment and other variables.[28] Accordingly, we do not find that the trial court abused its vast discretion in excluding sound readings from the Tenneco facility.
With regard to causation, Murphy argues that the trial court erred in finding that Murphy caused the Plaintiffs' hearing loss because there was insufficient evidence to show that Plaintiffs' average daily exposure equaled or exceeded 90 dBA. Murphy further argues that there was insufficient evidence to show that average daily exposure above 85 dBA, but below 90 dBA, could have caused Plaintiffs' hearing loss.
The measurement of an employee's exposure to noise is accomplished through either a dosimeter reading, where an employee wears a microphone throughout a typical workday, or a sound level meter, where microphones are placed at the typical proximity of an employee to noise-producing equipment and machinery. As noted by the trial court, it was Murphy's responsibility as early as 1971 to perform noise readings and retain records of same, pursuant to OSHA regulations. See 29 C.F.R. § 1910.95. However, as Plaintiffs emphasize, Murphy failed to maintain such records; furthermore, a violation of OSHA is not necessary to establish liability on the part of Murphy, as OSHA does not provide *900 a civil remedy for violations of the act.[29]
Plaintiffs emphasize several crucial pieces of evidence that were presented to the court at trial; notably, the sound survey evidence presented at trial was produced by Murphy. Plaintiffs first reference a 1989 inter-office memorandum which discusses the results of sounds surveys conducted by USF & G "which produced results ranging from 83.7 dBA to 87.2 dBA over an eight-hour time weighted average." The memorandum further read:
These results compare with a previous survey conducted in December 1988 in which the readings ranged from 80.1 dBA to 89.6 dBA. Six of the 8 samples in December were above the 85.0 dBA action level at which OSHA requires a hearing conservation program.[30] Based on these results, USF & G has recommended that hearing protection become mandatory for all employees inside the perimeter of the refinery equipment.
The document stated that Mr. Turnage, the safety director, indicated that "there were plans to survey most of the jobs in the areas considered to pose the greatest exposure risk." Plaintiffs submit that pursuant to that language, the surveys that revealed 80.1 to 89.6 dBA were not from the noisiest areas of the Murphy refinery.
Plaintiffs also reference a memorandum dated January 22, 1990, regarding dosimeter readings reported by USF & G. The memorandum acknowledges that "Meraux's latest noise dosimeter testing resulted in readings for many employees above the 90 dB[A] level for an 8-hour TWA [time-weighted average].[31] In response to these results, the mandatory hearing protection areas were expanded throughout the various units."
Additionally, Plaintiffs cite a 1988 report from USF & G dated December 20, 1988, discussing the results of a dosimetry survey. The Loss Control Report stated that "all employees were at or above the hearing conservation action level established by OSHA. Readings from five employees' dosimeters showed maximum exposure levels above 115 dB." The report's conclusion stated that "[t]he attached results show a dosimeter eight-hour, TWA (Time-Weighted Average) from 80 to 89.6 decibels. Maximum noise levels were read from 105 to 135 decibels."[32]
Next, Plaintiffs refer to a sound study dated September 22, 1988 which evidenced high readings of 106 decibels in the refinery and, significantly, up to 88 decibels in the break area. The "loss control report" read in part:
The lowest readings were obtained in the control room with only 70 decibels registering. Break areas in the area IIB Sulfur Unit showed 88 and 85 in area IV break area. The high reading of 106 [decibels] occurred under the heater in the Crude unit. Readings of 100 occurred near the gauges located at various equipment in all areas.
Plaintiffs also point to a noise survey conducted on October 5, 1983, which demonstrated that noise levels from equipment were measured at up to 134 dBA, and as high as 92 dBA in areas without equipment in close proximity. Similarly, an inter-office *901 correspondence document dated April 16, 1986 refers to "general area background noise" which reportedly "now ranges from 85 to 92 dBA."
Plaintiffs further submit that by as late as the year 2000, dosimeter readings evidence that employees who were operators (four of the Plaintiffs were operators) were exposed to noise levels over 90 decibels on a time-weighted average. An appendix to "Industrial Hygiene Evaluation" dated January 13 & 14, 2000,[33] revealed dosimetry readings for seven different operators. The findings indicated that the "highest impact noise level" during the measurement period[34] ranged from 132 decibels to 147 decibels; the "maximum continuous noise level" ranged from 100 dBA to 131 dBA; and for one operator, the average noise level was measured at 93 dBA.
In addition to this evidence, Plaintiffs also introduced evidence that dosimetry readings were often projected for an eight-hour work day; however, as the trial court acknowledged in its reasons for judgment, Plaintiffs often worked overtime several days per week. Plaintiffs also presented evidence that large pieces of noise-producing equipment, positioned together, would necessarily result in noise levels higher than the measurement reported on a sound survey. Robert Bruce, accepted by the court as an expert in acoustical engineering in the oil industry, testified:
Q. Okay. Now, did you review any documents that purported to show where Murphy Oil attempted to contract out to do, like you talked about in the beginning of your testimony, regarding reducing noise levels by engineering controls?
* * * *
A. Yes. They hired the McDermott Corporation to design and build a new unit for about 35 million dollars. And as the contract developed, they began to strike different units from that 35-million-dollar package. But they had $110,000.00 set aside for noise control. And what they had tried to do was to pass to McDermott the responsibility of controlling the employee noise exposures. McDermott is an engineering company and has no idea where workers go. So to say that you would design the plant and no one would violate the OSHA criteria as a result of working in the plant, you can't do that unless you know where the workers will be. So it is a give and take back and forth there. But they were trying to buy equipment that would be 90 dBA at basically 3 meters, or 1 meter of 3 feet, and there is a fallacy in that because almost every time you buy a piece of equipment that meets 90 dBA, you are going to have near it another piece of equipment that also is meeting 90 dBA, and so you are going to have more than 90 dBA, you are going to have 93 or 96 dBA as a result of that. [Emphasis added.]
Mr. Bruce also testified the sound level readings were generally taken after Murphy had initiated noise abatement; therefore, in his opinion, noise levels during the *902 1960s and 1970s were most certainly higher than the figures reflected in the noise survey results that were in evidence. Mr. Bruce further unequivocally testified that each individual Plaintiff in this case would have been exposed to over 90 dBA during a normal workday at Murphy:
Q. Now, I don't want to go over each individual plaintiff, but is it your opinion that each individual plaintiff would have been exposed to above 90 decibels on a time-weighted average over the course of their normal day at Murphy?
A. Yes. [Emphasis added.]
Plaintiffs also submitted evidence from Dr. Moises Arriaga, who, as previously noted herein, personally examined each Plaintiff, reviewed each Plaintiffs deposition testimony, and reviewed both sound survey and noise exposure documents in making his determinations. Considering all of the evidence, Dr. Arriaga testified that he attributed each Plaintiffs hearing loss to noise exposure while working at Murphy, finding that any alternate contributors were insignificant. Specifically, Dr. Arriaga diagnosed Plaintiffs with significant sensorineural high frequency hearing loss, noting Plaintiffs' reference to ringing in the ears, which Dr. Arriaga referred to as "temporary threshold shifts," which would ultimately result in a "permanent threshold shift."[35] Dr. Arriaga testified:
Dr. Arriaga:
I think prolonged exposure to 85 decibels on a regular basis for many years is the beginning of damage. But this level, I think we are looking at 90 decibels, and my experience has been that when people are exposed to that 90 decibel on
THE COURT:
Do you believe, in your expert opinion, that they were exposed to at least 90 decibels[36] over a period of their worklife?
Dr. Arriaga:
I think they were, yes, based on what they were telling me. And the story of the temporary threshold shifts, to me, is the most persuasive. [Emphasis added.]
Plaintiffs also presented testimony from Dr. Ross Roeser, an expert in audiology, who, like Dr. Arriaga, examined each Plaintiff, reviewed depositions, noise exposure documents, and sound surveys. Dr. Roeser similarly found that Plaintiffs suffered bilateral sensorineural hearing loss caused by occupational noise exposure at Murphy, and that any alternate causes of the hearing loss were insignificant.[37]
*903 Additionally, Dr. Roeser explained the process by which an employee's continuous exposure to high noise levels causes permanent hearing loss:
If you will permit me to show you, we have the hair cells that are in the inner ear (indicating). On the left, in the inner ear there are two sets of hair cells. One is an outer hair cell or outer hair cells, there are actually several rows, three, and then in the inner ear we have inner hair cells. The outer hair cells are the ones that are the most sensitive to very soft sounds. So when the energy enters the cochlea, they are stimulated up to 60 dB, six zero dB, and if that energy entering the cochlea is at a high level, then it literally destroys, it damages and destroys that row of hair cells in that particular part of the inner ear. And that area is in the high frequency area, typically in the 4,000 to 6,000-hertz region, if it's associated with continuous exposure to high noise levels.
Dr. Roeser also testified with regard to the differences between sudden and gradual hearing loss, noting that, of the two types, "if it's sudden, it's exposure to a single event, such as a gunshot. That is called traumatic hearing loss or traumatic noise-induced hearing loss." Dr. Roeser confirmed that each of the Plaintiffs in this case plainly suffered from gradual hearing loss. Because the loss is gradual, Dr. Roeser testified with regard to such hearing loss going undetected for long periods of time:
That is the unfortunate thing because the frequencies that are initially affected are above the frequencies that we use for hearing and understanding speech. Certainly, the frequencies in the range of above 3,000 are part of understanding speech. But the typical individual who has a noise-induced hearing loss will have repeated exposure. It will take, depending on the amount of time and the energy that is involved, it will take a considerable amount of time before that *904 individual has any indication that there is a problem. And I think we heard earlier, it's typically other people who identify it because of the lack of proper response.
Plaintiffs also set forth evidence of causation in the form of various expert literature. For example, Plaintiffs introduced a 1972 document entitled "Occupational Exposure to Noise" from the National Institute for Occupational Safety and Health ("NIOSH") which indicated that an eight-hour workday limit with regard to noise exposure should be 85 dBA.[38] Likewise, in 1974, the Environmental Protection Agency ("EPA") determined that 75 dBA was an appropriate level for a workday over eight hours;[39] and in 2008, the Council for Accreditation in Occupation Hearing Conservation recognized that a 90 dBA permissible exposure limit "sends the wrong message to employers" that exposures between 85 and 90 dBA are not hazardous and mandatory hearing protection is unnecessary.[40]
Additionally, as the trial court recounted in its reasons for judgment, Murphy failed to promptly comply with OSHA regulations of the Hearing Conservation Amendment of 1971, and, according to Murphy's witness, Murphy failed to establish a "Safety Practices Hearing Protection Program" until 1986 or 1987. An expert industrial hygienist, Vernon Rose, testified with regard to Murphy's failure to adequately implement a hearing conservation program over the years:
Q. Now, you have had the opportunity to review multiple documents in this case, including all of the corporate documents that have been provided through discovery. In reviewing those document[s], did you evaluate the Murphy Oil Hearing Conservation using those five steps?[41]
A. I did.
Q. And did you render any opinions to that effect?
A. I did.

*905 Q. Can you please state for the Court your opinions on those.
A. My first opinion was that the Hearing Conservation Program, in its entirety, not just audiometric exams but in its entirety, as I just described, recognizing and so forth, was not implemented completely, at least until sometime in the 1990's. The first steps were implemented in about 1971, according to the deposition testimony of Mr. Turnage, the safety supervisor at the refinery, where he said noise signs, noise area signs were up when he started working there, as I remember. We know at least for the five or six plaintiffs whose records we have seen, we see one, the earliest audiogram being given, and I don't remember which gentlemen it was, but 1974, I think he testified earlier this morning. So that is two things that we see happening in the early, maybe early to mid 1970's.
However, the next step of measuring is: What do you have out here? Do you have a problem, and what is it and where is it? It was not even looked at, at least until 1980 when Mr. Vince. . . . Vicidomina, who was it looks like a good engineer, he went out and made measurements, but just of equipment.
Then finally, we didn't have any measurements of actual worker exposure, at least that I have seen, at the workplace until 1988 when the insurance company came in, and you have heard discussion about that this morning, about the dosimeter readings. So that appears to be some 27 years after a number, at least four of the five guys who worked there in this flight, 27 years after they started working was the first time anybody made, at the plant, at the company, made any measurements of worker exposures.
And we have also heard that, well, the exposure levels that were measured were 85, 86, 83 and so forth. But I believe that there is a 1990 or so document, internally from the company which talks about a safety meeting that was held, appears at a corporate level, and I believe it was in Arkansas about 1990 or so. And in the minutes of that meeting, they covered a lot of safety subjects. When it got around to hearing conservation, and I don't remember the exact words but I will paraphrase it, the statement was made by the, I guess the corporate safety person to the attendees, including the local plant safety officer, that we still see dosimeter readings above 90 dBA. But it is what it is. It's in the record.
* * * *
Quote. This is the second to last paragraph on the page. "Meraux's latest noise dosimeter testing resulted in readings where many employees were above the 90 dBA level for an eight-hour TWA. In response to these results the mandatory hearing protection areas were expanded throughout the various units."
So that indicates that bythis was dated 1990. So by at least 1989the survey was done six months earlier or wheneverthere were still exposures to workers at the refinery above 90 dBA at an eight-hour time-weighted average.
It is well-settled in Louisiana that "[a] trial court may accept or reject in whole or in part the opinion expressed by an expert." Lanasa v. Harrison, XXXX-XXXX, 2002-0027, p. 4 (La.App. 4 Cir. 8/7/02), 828 So.2d 602, 605, writ denied, 2002-2512 (La.11/27/02), 831 So.2d 286. The effect and weight to be given to expert testimony is within the broad discretion of the trial court. Id. Here, not only the record but also the trial court's reasons for judgment demonstrate that the trial court *906 carefully considered and weighed evidence and testimony from all experts at trial, and concluded, in its discretion, that Appellees' experts were more credible. The trial court articulated in its reasons for judgment its "recogni[tion of] the customary disparity of expert testimony brought by Plaintiffs and Defendant respectively" and ultimately "conclude[d] the expert witnesses brought by Plaintiffs to be credible on the point of causation of hearing loss from the occupational noise[42] testified to and sound levels reviewed at Murphy Oil Refinery, awkwardly referred to by Murphy as a sufficient `dose level.'" Considering the foregoing, we cannot say that the trial court's credibility determinations with regard to expert witnesses or factual findings with regard to causation were manifestly erroneous or clearly wrong.[43]
*907 Murphy also makes an argument on appeal that the language in the trial court's reasons for judgment is unclear with regard to whether the court found that, more probably than not, Plaintiffs' daily average noise exposures exceeded 90 dBA. Specifically, the trial court stated:
It is difficult to discern a situation where Plaintiffs, with normal hearing at the commencement of their employment, are subjected to high or hazardous noise levels persistently over a work week, often spanning over a traditional eight (8) hour day for nearly thirty years (30) with reported decibel levels certainly exceeding 85dBA and very probably over 90 dBA on a persistent basis, capable of producing occupational hearing loss, is not a significant contributor to that hearing loss. [Emphasis added.]
We find that whether the trial court employed the language "very probably over 90 dBA" or "more likely than not. Plaintiffs' daily average noise exposures exceeded 90 dBA" to be a distinction without a difference. The trial court's reasons plainly articulated a finding that it was more likely than not that the occupational noise exposure at Murphy caused the Plaintiffs' hearing loss. This argument lacks merit.

Assignment of Error # 3
In its third assignment of error, Murphy argues that claims alleging pre-July 1, 1983 exposure are barred. Because Joseph Barcia alleged that he was exposed to harmful levels of noise during his employment with Murphy, and Murphy employed Mr. Barcia from 1961 through 1986, Murphy argues that the pre-1986 version of the Louisiana Workers' Compensation Act ("LWCA") governs Mr. Barcia's claims.
Plaintiffs assert that gradual hearing loss plainly does not fall within the definition of "accident" in any version of the LWCA; even before 1989, an accident was defined as "an unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury."[44]
*908 Likewise, Plaintiffs submit that a gradual injury with no identifiable moment of occurrence cannot be compensable as an injury by accident under the LWCA, because such injury simply could not occur "suddenly or violently." For example, with regard to railroad employees who suffered occupational noise exposure, the Second Circuit has recognized that "[a] hearing loss not specifically related to an incident or trauma has no identifiable moment of occurrence." Broussard v. Union Pac. R. Co., 29,769, p. 1 (La.App. 2 Cir. 8/28/97), 700 So.2d 542, 544, writ denied, 97-2414 (La.12/12/97), 704 So.2d 1202.[45] Most significantly, Louisiana courts have previously acknowledged that gradual hearing loss is not a compensable injury under the LWCA. See Connor v. Naylor Industrial Services, Inc., 579 So.2d 1226 (La.App. 3d Cir.1991); Sayrie v. Harbert International, 576 So.2d 1127 (La.App. 3d Cir.1991).
Murphy also argues that under the pre-July 1, 1983 version of La. R.S. 23:1221(4)(p), occupational hearing loss was compensable under the LWCA, regardless of the cause of the injury. In support of this argument, Murphy cites the previous version of the statute, which Murphy refers to as a "catch-all" provision:
In cases not falling within any of the provisions already made . . . where the usefulness of a physical function is seriously permanently impaired, the court may allow such compensation as is reasonable.
La. R.S. 23:1221(4)(p)(1982).
Murphy acknowledges that the subsection was changed in 1985 to allow compensation for permanent hearing loss caused only by a single traumatic accident:
(p) In cases not falling within any of the provisions already made, where the employee is seriously and permanently disfigured or suffers a permanent hearing loss solely due to a single traumatic accident, or where the usefulness of the physical function of the respiratory system, gastrointestinal system, or genitourinary system, as contained within the thoracic or abdominal cavities, is seriously and permanently impaired, compensation not to exceed sixty-six and two-thirds percent of wages for a period not to exceed one hundred weeks may be awarded. . . .
La. R.S. 23:1221(4)(p)(2010)(emphasis added).
Murphy relies upon several cases, none of which involve hearing loss, to support the theory that previous versions of the LWCA covered gradual hearing loss due to occupational noise exposure: Ferguson v. HDE, Inc., 270 So.2d 867 (La.1973) *909 (stroke compensable under LWCA because it happened "suddenly and violently"); Parks v. Insurance Company of North America, 340 So.2d 276 (La.1976)(bronchitis compensable under LWCA because the illness "was unexpected and unforeseen and occurred suddenly producing at the time objective symptoms"); Hale v. Pinecrest State School, 505 So.2d 987 (La.App. 3d Cir.1987)(ruptured disc compensable when caused by single work-related accident on a specific date); McCoy v. Kroger Co., 431 So.2d 824 (La.App. 2 Cir.1983)(aggravation of a degenerative foot condition compensable); Gotte v. Cities Service Oil Co., 298 So.2d 920 (La.App. 3d Cir.1974)(pneumonia caused by exposure to extreme temperature variations on or about October 29, 1969 was compensable).[46]
Murphy's reliance on Chatelain v. American Can Co., 344 So.2d 1180 (La. App. 4th Cir. 1977) is misplaced. The employee in Chatelain brought suit seeking workers' compensation benefits and total disability, arguing that his partial hearing loss was caused by his employer. The court ultimately held that the employee did not demonstrate that it was more likely than not that an "industrial accident" occurred; nor did the employee prove that it was causally related to his disability.[47] Contrary to Murphy's assertion, we do not find the court's remark that "extraordinary physical stress and strain is not essential to the definition of disabling accident" stands for the proposition that Louisiana courts have determined that gradual hearing loss caused by occupational noise exposure is compensable under the LWCA.[48]
Murphy concedes that Comoletti v. Ideal Cement Co., 147 So.2d 711 (La.App. 1st Cir.1962) held that under the pre-1983 *910 version of the LWCA, hearing loss caused by gradual or chronic noise exposure was not a personal injury by accident, noting that "[i]f the disability comes on gradually, it is not an accident but an occupational disease." Comoletti, 147 So.2d at 717 (quoting Valentine v. Godchaux Sugars, Inc., 90 So.2d 442 (La.App. Orl.1956); Mauchline v. State Ins. Fund, 279 Pa. 524, 124 A. 168 (1924)). Comoletti involved a laborer who was injured while "shooting kilns" for his employer, Ideal Cement Company.[49] The First Circuit ultimately held that the injury was compensable under the LWCA because it was "most unlikely" that the employee's hearing loss "resulted from gradual and protracted exposure to noise but rather it was occasioned suddenly and unexpectedly as a result of his exposure to noise of excessive and unusual intensity on a specific date, namely, July 28, 1960." Comoletti, 147 So.2d at 719 (emphasis added). Thus, the court held that the employee's hearing loss "resulted from an `accident' within the meaning of the term as employed in our workmen's compensation statute." Id.
Murphy cites no case wherein an employee was granted workers' compensation benefits for gradual hearing loss due to occupational noise exposure, nor does Murphy cite a case which holds that gradual hearing loss is a compensable "accident" under the LWCA. Considering the foregoing, we conclude that gradual hearing loss resulting from occupational noise exposure over a period of many years simply cannot meet the definition of an "accident" under any version of the LWCA. Likewise, the trial court did not err in finding that Mr. Barcia's claims are not a basis for recovery under the LWCA as an occupational disease.[50]

*911 Assignment of Error # 4
In its final assignment of error, Murphy argues that the claims asserted by Mr. DiCarlo, Mr. Baudean, and Mr. Becker have prescribed, and that the trial court erred in determining that contra non valentem applied.
Delictual actions are subject to a liberative prescription period of one year from the date of injury or damage. La. Civ.Code art. 3492. If prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to demonstrate that the action has not prescribed. Campo v. Correa, 2001-2707, p. 7 (La.6/21/02), 828 So.2d 502, 508.
The "ancient civilian doctrine" of contra non valentem agere nulla currit praescriptio "has been recognized from Louisiana's earliest jurisprudence." Corsey v. State, Through Dept. of Corr., 375 So.2d 1319, 1321 (La.1979). The doctrine "prevents the running of liberative prescription where the cause of action is not known or reasonably knowable by the plaintiff." Cole v. Celotex Corp., 620 So.2d 1154, 1156 (La.1993).[51] Louisiana jurisprudence has recognized that "mere apprehension" is insufficient to commence the running of prescription:
This Court has held that "[p]rescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong." Hoerner v. Wesley-Jensen, Inc., 95-0553, pp. 3-4 (La.App. 4 Cir. 11/20/96), 684 So.2d 508, 510 (quoting Jordan v. Employee Transfer Corp., 509 So.2d 420, 423 (La.1987)). Rather, prescription begins to run against a claimant when he obtains actual or constructive knowledge of facts indicating a cause of action. Campo v. Correa, 2001-2707, pp. 11-12 (La.6/21/02), 828 So.2d 502, 510. Constructive knowledge of facts "is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." Campo, 2001-2007 [2001-2707], p. 12, 828 So.2d at 510-11. Constructive knowledge is also "tantamount to knowledge or notice of everything to which a reasonable inquiry may lead," and is sufficient to commence the running of prescription. Id., p. 12, 828 So.2d at 511. Mere apprehension that something could be wrong, however, is not considered constructive knowledge sufficient to begin the running of prescription. In re Medical Review Panel of Howard, 573 So.2d 472, 474 (La.1991); Cordova v. Hartford Accident & Indemnity Co., 387 So.2d 574, 577 (La.1980).
*912 Guillot v. Daimlerchrysler Corp., 2008-1485, pp. 4-5 (La.App. 4 Cir. 9/24/10), 50 So.3d 173, 180 (emphasis added).
In support of the argument that the claims of Mr. DiCarlo, Mr. Baudean, and Mr. Becker have prescribed, Murphy relies in part on Marin v. Exxon Mobil Corp., 2009-2368, 2009-2371 (La.10/19/10), 48 So.3d 234. Marin involved an allegation of oilfield contamination of sugarcane fields, and the plaintiffs filed suit against Exxon for remediation of the soil and groundwater, in addition to other damages.[52] Exxon argued that the plaintiffs' claims had prescribed because they were aware of the contamination as early as 1991, yet did not file suit until 2003. The Louisiana Supreme Court reversed the appellate court's finding that contra non valentem applied, noting that "at least by the 1980's, plaintiffs knew that sugarcane would not grow in areas surrounding the pits." Marin, 2009-2368, p. 15, 48 So.3d at 247. Additionally, on September 23, 1987, a spokesperson for the landowner plaintiffs met with an Exxon representative and "told him that he was aware that Exxon had been dumping in the pits for 40 years and the landowners `want every bit of contamination removed from the site and new dirt hauled in.'" Id. The Court further found that as early as 1991,[53] plaintiffs knew sugarcane would not grow on the land, causing them to demand Exxon to clean and close the pits. Id. at p. 16, 48 So.3d 234. Even considering the landowner's spokesperson's testimony that it would take four years to learn whether sugarcane was healthy, the Court cited his testimony that "the sugarcane never did grow in some of the pit areas and has still not grown there today." Marin, p. 20, 48 So.3d at 249. Accordingly, the Court found that at least by 1995, plaintiffs had sufficient knowledge of the contaminants and the relationship between the contaminants and resulting dying sugarcane more *913 than one year prior to filing suit in 2003. Marin, pp. 20-21, 48 So.3d at 250.
Murphy cites language from Marin where the Court states that "prescription runs from the date on which [a plaintiff] first suffered actual and appreciable damage,. . . even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damage as a result of the completed tortious act." Marin, p. 14, 48 So.3d at 246 (quoting Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 354 (La.1992)).[54] The Court found that the "outward sign of actual and appreciable damage" of the dying sugarcane was sufficient to excite the plaintiffs' attention to investigate further by at least 1995, and it was therefore unreasonable to wait until 2003 to file suit. Marin, p. 20, 48 So.3d at 250.
We find Marin inapplicable for Murphy's proposition that contra non valentem was wrongly determined by the trial court in this case. First, when using the term "appreciable damage," the Marin Court quoted at length from Eastin v. Entergy Corp. to expressly distinguish the facts of the case from long-latency cases:
We distinguish the instant case from those in which the doctrine has traditionally applied: those cases involving medical malpractice actions (In Re: Medical Review Panel of Howard, 573 So.2d 472 (La.1991); Branch v. Willis-Knighton Medical Center, 92-3086 (La. 4/28/94), 636 So.2d 211 (Prescriptive period did not commence until plaintiffs discovered the damage, the delict and their relationship, when disease was diagnosed)); long-latency diseases (Brown v. R.J. Reynolds Tobacco Co., 52 F.3d 524 (5th Cir.1995) (Plaintiff cannot learn of damages suffered until many years after exposure); Cole v. Celotex, 620 So.2d 1154 (La.1993) (Damage is considered to have been sustained only when it has manifested itself with sufficient certainty to support the accrual of the cause of action); Watkins v. J. Ray McDermott, Inc., 466 So.2d 636 (La.App. 5 Cir.1985), Richardson, Jr. v. Avondale Shipyards, Inc., 600 So.2d 801 (La.App. 5 Cir.1992) (Where a progressive occupational disease is involved, prescription begins to run when the disease has manifested itself and the victim is aware of it)); or torts involving juveniles (Wimberly v. Gatch, 93-2361 (La.4/11/94), 635 So.2d 206 (Doctrine of contra non valentem suspended running of prescription until parents of molested child learned about molestation)). None of these circumstances exist in this case [employment discrimination] and are easily distinguishable because the plaintiffs in those cases were prevented from knowing of their damages until some time after the action or inaction of the defendant, i.e., the damages manifested at a later date.
Marin, 48 So.3d at 270, n. 14 (quoting Eastin v. Entergy Corp., 03-1030 (La.2/6/04), 865 So.2d 49, 55, n. 4).[55] Furthermore, *914 we are not persuaded that a case involving property damage to sugarcane is factually analogous to the reasonableness of discovery of hearing loss caused by occupational noise exposure.
Similarly, like the trial court, we find that Murphy's reliance upon Sellers v. Lykes Brothers Steamship Co., Inc., 94-1107 (La.App. 4 Cir. 12/28/94), 648 So.2d 496, is misplaced. Although the Sellers court found that the plaintiff-employee's suit under the Jones Act had prescribed, the employee in Sellers alleged that he did not learn of his hearing loss until over twenty years after leaving his employment. Sellers, 94-1107, p. 4, 648 So.2d at 497. Accordingly, Sellers is inapplicable to the facts of this case.
With regard to specific Plaintiffs, Murphy cites the aforementioned remark by Mr. DiCarlo that "[b]y [1974], I had lost my hearing" for the proposition that Mr. DiCarlo was not only aware of the hearing loss damage but also the source of the damage; therefore, Murphy argues, Mr. DiCarlo's claims have prescribed. It is apparent from the record that Mr. DiCarlo, who was 76 years old at the time of trial, had difficulty recalling events and facts from over four decades ago. Additionally, Plaintiffs introduced into evidence audiograms of Mr. DiCarlo from 1974, 1976, 1981, and 1982 which documented that Mr. DiCarlo stated he felt his hearing was "good."
Finally, Murphy argues that a 1997 audiogram from the Universal Health Occupational Health Clinic, purportedly signed by Mr. Baudean, established that Mr. Baudean had knowledge of an actual and appreciable injury more than one year before suit was filed. Similarly, Murphy argues that a "Notice of Hearing Shift" purportedly signed by Mr. Becker in 1987 demonstrated that Mr. Becker had knowledge that his hearing had worsened.
Mr. Baudean testified at trial that he had never seen the 1997 audiogram from Universal Health Occupational Health Clinic; likewise, Mr. Becker testified that he did not recall seeing the "Notice of Hearing Shift" document. Neither the 1997 audiogram nor the 1987 "Notice of Hearing Shift" mentions permanent hearing loss. Nevertheless, Murphy maintains that both Mr. Baudean and Mr. Becker read the documents and are presumed to have understood them. However, Murphy relies upon a case involving contract law for this proposition.[56] We find the alleged presumption that Mr. Baudean and Mr. Becker read and understood the contents of the 1997 and 1987 documents inapplicable, particularly considering the testimony that they did not recall seeing the documents at all.
Furthermore, Mr. Baudean and Mr. Becker are not experts and could not diagnose the disease. See Cole v. Celotex, 620 So.2d 1154 (La.1993);[57]Hughes v. Olin *915 Corp., 37,404, p. 12 (La.App.2d Cir.10/3/03), 856 So.2d 222, 229, writ denied, 2003-3191 (La.2/20/04), 866 So.2d 828 (plaintiff "brought his suit within one year of his learning that he had a lung cancer related to asbestos exposure, as opposed to a cancer that could be traced to his lengthy, prior smoking history or was otherwise not related to asbestos exposure.").[58] Similarly, "[t]here must be knowledge of the tortious act, the damage caused by the tortious act, and the causal link between the act and the damage before one can be said to have `constructive notice' of one's cause of action." Ducre v. Mine Safety Appliances, 963 F.2d 757, 760 (5th Cir.1992)(citing Knaps v. B & B Chem. Co. Inc., 828 F.2d 1138, 1139 (5th Cir.1987)).
As the trial court acknowledged, Plaintiffs were not trained by Murphy regarding OSHA or the use of earplugs, nor were they advised that the refinery noise could lead to permanent hearing loss. Mr. Phillips,[59] Mr. Baudean,[60] Mr. Becker,[61] Mr. *916 DiCarlo,[62] and Mr. Barcia[63] each testified that if hearing protection was available, it was never discussed, either in meetings or otherwise; they were not instructed on the use of hearing protection; and none could recall any signs in the refinery advising of the danger of noise or that hearing protection was mandatory in any area of the refinery.
We find the jurisprudence with regard to occupational exposure to asbestos instructive in this case. Like asbestos exposure, it is incredibly difficult to determine precisely at what point a cause of action accrues with occupational noise exposure.
*917 The Louisiana Supreme Court in Austin v. Abney Mills, Inc., acknowledged this "herculean task":
In Cole, we recognized that cases arising from occupational exposures present peculiar difficulties in determining when an injured plaintiffs cause of action accrues.
The difficulties in asbestosis cases arise because, unlike in traditional personal injury cases in which the damage results from a single, identifiable act causing traumatic injury, in asbestosis cases the damage results from a continuous processa slow development of this hidden disease over the years. Compounding the problem, asbestosis cases are characterized by a lengthy latency periodtypically ranging a decade or twoand, consequently, a lengthy temporal separation between the tortious conduct and the appearance of injury. This lengthy latency period renders efforts to pinpoint the date on which the disease was contracted virtually impossible, medically and legally. Further, this inability to pinpoint when injuries were sustained in asbestosis cases renders determining the date on which a plaintiff's cause of action accrued a herculean task.
Austin v. Abney Mills, Inc., 2001-1598, p. 25 (La.9/4/02), 824 So.2d 1137, 1153-54 (quoting Cole, 599 So.2d at 1065)(internal citations omitted)(emphasis added). The Court further recognized that "it is impossible practically to determine the point at which the fibers actually imbed themselves in the victim's lungs. . . ." Austin, 2001-1598, p. 25, 824 So.2d at 1154.
Considering the totality of the circumstances, we find no error on the part of the trial court in its determination that the claims of Mr. DiCarlo, Mr. Baudean, and Mr. Becker had not prescribed. This assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the trial court's judgment is affirmed.
AFFIRMED
TOBIAS, J., concurs in part, dissents in part, and assigns reasons.
TOBIAS, J., concurs in part, dissents in part, and assigns reasons.
As the Louisiana Supreme Court has said and the Louisiana Courts of Appeal have reiterated many times:
The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Nonetheless, this Court has emphasized that the reviewing court must always keep in mind that if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
See, Stobart v. State, Dept. of Transportation & Development, 617 So.2d 880, 882 (La.1993) (internal citations and quotation marks omitted). With the foregoing in *918 mind, I conclude that this court is required to affirm the trial court's decision insofar as the trial court judgment awards damages to Joseph Barcia, Marvin Baudean, Peter Becker, Jr., and Roy Phillips and dismisses the claims of Ronald Gilmore; but I find that an affirmation of the award to Salvadore A. DiCarlo is legal error because his claim is prescribed. My comments follow:
Murphy Oil USA, Inc. (a/k/a and f/k/a Murphy Oil Corporation) ("Murphy") contends that the plaintiffs failed to prove that their exposure to noise was "dose sufficient" to cause long-term hearing loss versus gradual hearing loss due to the passage of time and the aging process.[1] The plaintiffs are now senior citizens. Stated another way, the question presented is: Did an average exposure to noise during the workweek above 85 dBA but below 90 dBA for extended periods of time cause a hearing loss to these plaintiffs? The trial court held in the affirmative, finding that Messrs. Barcia, Baudean, Becker, Phillips, and DiCarlo were exposed to 85 dBA and "most probably" were exposed to levels at or greater than 90 dBA.[2]
The plaintiffs' expert, Dr. Moises Arriaga, relied on a sound level meter that registers a single reading of a noise area at one particular point in time, thus merely shedding light on the sound intensity at that moment, but failing to measure duration of exposure. He opined that the plaintiffs were exposed to sufficient noise on a time weighted average (over an eight-hour day workweek for years) to cause a gradual hearing loss over time. He further relied upon the reporting of two witnesses that stated they had experienced temporary threshold shift (i.e., at the end of a work shift they experienced a ringing in their ears and a sense of decreased hearing loss) to substantiate noise exposure significant to cause a hearing loss. This evidence is, in my opinion, weak because it does not take into account each plaintiffs location in the Murphy facility. While the two witnesses did testify to experiencing temporary threshold shift, they failed to testify as to the frequency of experiencing the effect. Arguably this could negate or minimalize the strength of plaintiffs' expert's opinion. Contrariwise, Murphy's monitoring of 29 of its employees using a dosimeter found but one instance of exposure to 90 dBA on a time weighted average.
Although the trial court opined that Murphy failed to provide an alternative cause for the plaintiffs' hearing loss, such was not Murphy's burden. It was incumbent upon the plaintiffs to establish that the noise exposure at the Murphy facility more likely than not caused each plaintiff's hearing loss; that is, it was not Murphy's burden to prove that something other than noise at their facility caused the hearing loss. Actually, the record per se reflects another theory of the plaintiffs' hearing loss at the time suit was filed, to-wit, age of the plaintiffs and their mere continuing to remain alive.
Murphy asserts that the trial judge is wrong to emphasize long-term exposure to noise to substantiate his findings; the length of time of exposure would be irrelevant if the level ("dose") of exposure over time was insufficient to cause a loss of hearing. Such brings one back to the ultimate question of whether or not exposure *919 to more than 85 dBA on a time weighted average, but less than 90 dBA, is substantial enough to cause a meaningful hearing loss.
Thus the trial court had to choose between two conflicting opinions of experts. On the one hand, plaintiffs' expert relies on sound level measurements to postulate that the time weighted average of noise that the plaintiffs were regularly exposed to as at or exceeded 90 dBA. On the other hand, Murphy's expert, relying on dosimeter readings, says the opposite and that anything less than 90 dBA would not have caused the hearing loss of which the plaintiffs complain. It is within the discretion of the trial judge to accept one expert's opinion over that of another expert. And as the Court said in Stobart, although an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony and the reviewing court must always keep in mind that if the trial court findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
I do not find that the trial court's refusal to admit evidence of similar noise exposure at Tenneco Oil's facility is error. Murphy sought to introduce the evidence to corroborate its expert's opinion that dosimeter (versus sound level meter) readings on a time weighed average show that the noise exposure of the plaintiffs could not have caused their hearing loss. Although the sound-causing machinery at Tenneco Oil may have been similar, we lack evidence of where and how the machinery was situated and the proximity of machines to each other. That is, the evidence sounds in speculation.
The prescription issue and whether the doctrine of contra non valentem agere nulla currit praescriptio[3] applies is a relatively close question under the facts of this case at least as to some of the plaintiffs. The trial court clearly concluded that the plaintiffs were simple-minded, never connecting the noise exposure at work as a cause of their hearing loss. In part, this is based upon some evidence that Murphy may not have revealed to the plaintiffs the results of audiograms, et cetera, coupled with the plaintiffs' lack of recollection of ever being told the results of hearing tests that would disclose hearing impairment. I do not find that the trial court's holding is manifestly erroneous or clearly wrong except as to Mr. DiCarlo.
The following excerpts are taken from Mr. DiCarlo's testimony:
* * *
Q What was your next job?
A Then I went to in the units as an operator and I stoodI was a cat helper, a catalyst operator helper, I guess a year or two years. I don't remember really.
Q All right. Since you started at Murphy as a lab tester, and now we *920 have you as a cat helper, what was the nosiest place you worked in those first four positions?
A Well, it was one steady noise in the units. You understand? My worst noise I ever heard was when I worked on the boilers, which was my next job.
* * *
Q Describe the control room for the boilers when you went there.
A I couldn't believe I was working there, the conditions with the noise. The control room was, more or less, they had tin around the building, around the boilers, and some of it was missing and the noise was terrible.
Q How long did you stay at the boiler?
A One year.
* * *
Q In an average five-day week, how much time did you spend in your shop versus how much time did you spend in the units?
A Well, I guess about 90 percent of the time I was out in the units. That is where the work was. The only time we worked out of the shop is when we had to take measurements in the units and come cut the insulation.
Q Were there any parts of this plant more noisy than others, in your opinion?
A Yes.
Q Tell us what they were.
A The cat crackers had a lot of noise and the boilers was the worse.
* * *
Q Let's try to tie it to what job you had. What were you doing when hearing protection finally came to Murphy Oil?
A Hearing protection came, I think, in '74. By that time I had lost my hearing.
Q When you say it came, tell me how you know it came to Murphy at that point?
A What, the year?
Q No, you said '74. What happened in '74?
A I think the hearing plugs came into play.
Q All right. They were made available to you?
A Yes, either maybe in '74 or a little bit later. That has been so long ago, I can't remember the time.
* * *
Q And you currently use hearing protection when using that riding mower?
A I did. When I retired I wore the hearing aids, I mean the earplugs, and it got so that if I didn't have them on, it didn't make no difference. I was so used to the noise, you know.
* * *
Q And also, when you did insulation work, did you ever have to do insulation work around the platform heaters?
A Yes, in the area, yes.
Q And weren't there signs warning about loud noises and using hearing protection near the platform heaters?
A That came into play later. Like I said, the hearing plugs came into play in '74. I don't recall what signs, you know. You are talking about 45 years plus.
Q So is it fair to say that there may have been signs, you just don't remember?
A I don't remember.
Q And I believe you said that the worse noise was when you worked around the boilers?
A Yes.

*921 Q And you worked around the boilers about one year?
A That's correct, one year.
* * *
Q And sometime in the early 70's Murphy made hearing protection available?
A That is what I was told, yes. As far as I know '74.
Q And the hearing protection that was available in '74 going forward was earplugs or earmuffs, is that correct?
A Yes.
Q And starting back around this time, hearing protection was available in boxes in the control room?
A I think so. I am not quite sure, you know.
Q Hearing protection was also available in the warehouse, correct?
A Oh, you meanyeah, for distribution.
Q Yes, you cold pickup the plugs or the earmuffs, whatever you wanted to use?
A Yes, yes, yes.
Q They were also available in the safety department, correct?
A I guess so, yes. Yes.
Q And when you were out on the units making your rounds, you wore hearing protection, didn't you, when you were an operator?
A Before '74, I didn't.
Q After 1974.
A I am sorry. Yes.
* * *
Q And when you were working with insulation, you would be all over the refinery, correct?
A That's right.
Q And the noise that would have existed would have been as a result of the equipment that was running near the area where you were working?
A Yes, pumps and so forth, compressors and whatever.
Q When you were working around these areas in the units where they had running equipment that was causing the noise, the noise wasn't so bad that you would have trouble communicating with the person next to you, correct?
A It all depends how close you were to the equipment.
Q So there were times when you wouldn't have trouble and there were times when you did?
A Yes, yes, yes.
* * *
Q By the time hearing protection came to Murphy in '74, you had already noticed that you had a hearing loss?
A Yes. Yes. I couldn't help but lose my hearing with all that noise around there. Especially when I worked the boilers.
* * *
Q The question was brought up about heaters. What provides the heat in the heater?
A Well, the boilers, the heaters, they are gas-fired heaters and they made a lot of noise, too, the heaters.
* * *
Q I am going to show you Exhibit 114.
THE COURT:
Plaintiff or defense?
MR. J. WAYNE MUMPHREY:
Plaintiff.
MS. FISCHMAN:
We have it. Thank you.
Q First I want to ask you, Mr. Di-Carlo, on 114, is that your signature?

*922 A Yes.
Q And the date on it?
A (No response.)
Q What is the date?
A It's 04/02/82.
Q Did you have diabetes in 1982?
A I don't think so.
Q And this is your audiogram from '82? That is your signature?
A Yes, that is my signature.
As the trial court noted in its reasons for judgment and the record reflects, Mr. Di-Carlo stated: "Yes, yes, I couldn't help but lose my hearing with all that noise around there. Especially when I worked around the boilers." (Mr. DiCarlo ended his employment with Murphy in 1993; therefore, any hearing-damaging noise that he experienced occurred more than one year prior to his filing suit.) Although the trial court tries to minimize Mr. DiCarlo's testimony about his knowledge of noise at Murphy actually causing his hearing loss to reach its conclusion, unlike the remaining plaintiffs for whom an award is made, I find that his testimony when read as a whole and as noted more specifically above is (a) sufficiently unambiguous and (b) establishes that a reasonable person would have inquired further to ascertain whether the noise at Murphy was causing a hearing loss. Therefore, I do not find that Mr. DiCarlo can claim the benefits of the fourth category of contra non valentem, and his claim is thus prescribed.
In sum, I respectfully concur in the majority's decision to affirm the judgment in favor of Messrs. Barcia, Baudean, Becker, and Phillips for I find that the trial court's decision is neither manifestly erroneous nor clearly wrong as to them. I respectfully dissent from the majority's affirmation of the judgment in favor of Mr. DiCarlo.
NOTES
[1] These six plaintiffs comprised the first trial flight of a larger group of approximately forty-seven plaintiffs.
[2] The petition for damages specifically alleged that the amount of damages suffered to each plaintiff did not exceed $50,000.00, exclusive of interest and costs.
[3] Murphy also filed an exception of prescription, which the court deferred until trial and dismissed in the March 22, 2010 judgment.
[4] Upon granting the new trial, the court included the language "each together with judicial interest to run from the date of the pleading by which each plaintiff was added to this action" in the July 22, 2010 judgment.
[5] Plaintiffs' expert. Dr. Ross Roeser, explained at trial how the human ear responds to sound and how an audiogram measures this response to sound:

The ear is sensitive to pressure changes in the environment, and pressure changes are generated by something that is set into motion. So, there is a vibrator. For the purposes of explaining this, it's easy to use an object like a tuning fork, because when a tuning fork is the set into motion [sic] it goes back and forth, and that backward and forward motion sets up vibratory patterns that are carried by the air and then picked up by the ear, and entered into the auditory system through the ear canal, that cause the ear drum or tympanic membrane to vibrate or go back in forth in unison with the vibrations. Then that backward and forward motion is carried into the inner ear or the cochlea. The cochlea is responsible for the auditory sensation, or for hearing as well as balance, and that information, then, is converted to an electrical signal delivered to the central auditory nervous system and perceived as sound.
Dr. Roeser further testified, that a person's auditory system responds to frequencies between 20 and 20,000 hertz, or cycles per second; frequencies typically tested in routine audiometry are between 125 to 8,000 hertz. Speech, for example, is generally considered to be in the three to 3,000 hertz range. Dr. Roeser further testified regarding the typical characteristics of noise-induced hearing loss, including an explanation of the term "notch":
The typical noise-induced hearing loss is high frequency, it starts in the high frequencies. It is sloping. By the high frequencies, the initial insult is in the 4,000 to 6,000-hertz region. It grows, or I should say it expands or extends if the hearing loss or if the structure is damaged more, and typically there will be an increase or an improvement of the hearing at 8,000. And you call that a notch.
[6] Dr. Roeser testified that "[t]he resulting hearing loss from being exposed to high noise levels would be classified as a sensorineural hearing loss" (bold added).
[7] Dr. Arriaga testified that it was more probable than not that Mr. Barcia's occupational noise exposure while at Murphy was the cause of his permanent hearing loss (bold added):

Q. Do you have an opinion as to what the cause of Mr. Barcia's hearing loss is?
A. My opinion is that occupational noise at Murphy is the most significant contributing factor to his hearing loss at the time that he left Murphy Oil.
Q. And that is on a more probable than not basis, correct?
A. Yes.
[8] Dr. Arriaga testified with respect to Mr. Barcia that "[t]here was not a significant family history that made me concerned about a medical or genetic issue" and that "from the standpoint of other sources of noise, I didn't see any other significant sources of noise in his history that compared with his occupational exposure at Murphy." When asked about Mr. Barcia's previous employment. Dr. Arriaga testified that "I did look at [Mr. Barcia's prior employment as a potential factor for contributing hearing loss], I considered it, but J did not think it was a significant factor."
[9] Dr. Arriaga explained the term "temporary threshold shift" and its key role in his diagnosis (bold added):

Q. Now with all of these plaintiffs, you saw multiple audiograms for all of them that were provided through either Murphy Oil or through some additional testing. You just haven't rendered an opinion based off of one audiogram, is that correct?
A. I will look at an audiogram like a data point. It is just a piece of the puzzle. Accumulative audiograms are helpful, the history is real important, and to me, what really is critical, because these numbers and memories are so long ago, but the one memory that is hard to shake is this business about having your ears feeling clogged and ringing at the end of the work shift, what we call a temporary threshold shift. To me, that is a key piece of data in all of this.
[10] With regard to his physical exam on Mr. Barcia, Dr. Arriaga explained the significance of the term "permanent threshold shift" (bold added).

Q. Did [Mr. Barcia] present with any type of temporary threshold shift in his history? Did he present that to you?
A. Yes, he did. He indicated that he had a plugged feeling and ringing in his ear at the end of a work shift.
Q. And what else does that indicate to you when making an evaluation?
A That is actually a big deal, because what that tells me is that the patient's ears were feeling noise loud enough to bruise the inner ear. And enough of these bruisings over time results in what we call a permanent threshold shift or a permanent hearing loss. But that temporary plugging and ringing is characteristic of loud noise exposure, usually toxic noise exposure.
[11] The trial court acknowledged that Murphy produced a 1997 document indicating results of an audiogram which Mr. Baudean signed; however, Mr. Baudean testified that he had never seen the document and was never advised by Murphy of those results.
[12] Dr. Arriaga testified that it was his opinion that the chemotherapy treatment was not a factor in Mr. Baudean's permanent hearing loss:

The answer is, no. There was one issue, I think, that created a lot of discussion back and forth, and that was the possibility of whether or not some medicine he took for his cancer, a chemotherapy medicine, may have affected him. But my final assessment was he got that way after he had left the last employment issue [sic] at Murphy. So it wasn't an issue.
[13] Dr. Arriaga testified that "there is a wealth of literature that suggests that basic training in the military is very low risk [for hearing loss]." Additionally, Dr. Arriaga recounted his personal experience in the Air Force as an otologist:

... I was in the Air Force as my first duty as an otologist and at the base where everybody went through basic training. And we had thousands of kids going through basic training on a regular basis. It's a cycle, it's a six-week thing, and we just were not seeing noise-induced shooting-related hearing loss on a regular basis with the exception of when something dramatic or weird happened, such as an explosion, and someone that wasn't prepared, or someone that is out in the field, or people that came back from the real shooting wars that were going on.
[14] Dr. Arriaga did not attribute Mr. Becker's hearing loss to his service in the Air Force, either as a medic or in the maternity ward;

Q. Prior employment?
A. I considered that, but he worked as a medic in the Air Force and I didn't really think that prior employment was a significant factor in terms of his hearing loss.
Q. What about his time in the Air Force, working in the maternity ward?
A. I think it's a different type of loud.
[15] Dr. Arriaga testified (bold added):

Q And as far as your opinion as to Mr. Becker, can you please tell the court what that opinion is?
A. I think that occupational noise at Murphy was more likely than not a significant contributing factor to his bilateral high frequency nerve loss.
[16] Dr. Arriaga testified that he did not find that Mr. Becker's history of smoking to be a substantial contributing cause of his permanent hearing loss, nor did he generally attribute smoking to this type of hearing loss:

Q. What about smoking? I have continually heard questions regarding smoking, so why don't we clear this up. What is your opinion as to smoking and hearing loss?
A. Smoking is definitely something that is worrisome for a lot of reasons, and part of accumulating evidence is that smoking affects small blood vessel circulation, and there is finally starting to appear some data that shows when you compare the hearing in smokers versus nonsmokers there is a tiny difference that you can prove statistically. But the thing about that is when we say it's a statistically significant difference, it's not actually a large difference. So, yes, smoking is a risk factor but it's not a significant contributor to these people's hearing loss.
Q. Smoking wouldn't cause this type of hearing loss that you are seeing with the past three plaintiffs [Mr. Becker, Mr. Baudean, and Mr. Barcia] that we are looking at?
A. No.
Dr. Arriaga further testified that diabetes "falls into the same category" as smoking, and he did not consider it to be a "significant contributor" to permanent hearing loss.
[17] Dr. Arriaga testified (bold added):

Q. So would you please tell the court your opinion as to what you believe the cause of Mr. DiCarlo's hearing loss would be?
A. While there are a number of potential contributors, I think more likely than not occupational noise is the most significant contributing factor to his hearing loss.
[18] While explaining one of Mr. DiCarlo's audiograms, Dr. Arriaga testified that age was not a factor in Mr. DiCarlo's hearing loss:

Q. Now, in looking at [Mr. DiCarlo's] audiogram, what does that particular type of audiogram show you?
A. It shows not only high frequency hearing loss, but it has a very typical notch right at 4,000 hertz withit's actually a pretty deep notch with both ears being very symmetric at that level. There is a little bit of an asymmetry at the low frequencies, but this is certainly very consistent with a noise-induced hearing loss as one factor. And then when we add the history of the noise exposure and the lack of other factors, it really points to occupational noise in the full spectrum.
Q. Now I am going to anticipate a question that might come up on cross. Is that notch too deep?
A. Too deep?
Q. Too deep as far as noise causing that particular notch?
A. I don't think so. Medically it's actually very interesting as we are learning about notches and those frequencies. It turns out all of our inner ears are not shaped exactly the same. And where that notch occurs depends a lot on the shape of your ear, and even the shape of the inner ear, and what that acoustic residence ends up doing, what that noise, where it impacts the most. So this is well within the realm. And I do a lot of teaching and if I were teaching a resident and showed him this audiogram and give him a multiple choice question of what do you think caused it, they better say noise as their one, two, three and four before they get to number five.
Q. So if someone were to check age, they would be wrong?
A. They would be wrong.
[19] Dr. Arriaga testified that Murphy was the most significant contributing factor in Mr. Phillip's hearing loss, and explained the asymmetry in Mr. Phillips' hearing loss:

A. He has bilateralwell, he's got sensorineural loss on both sides but there is an asymmetry with the right side being a profound loss and the left side being a more typical high frequency hearing loss.
Q. Now, did he present with significant family history for hearing loss?
A. Not that I would have that explains his hearing level, no.
Q. And he was in the military?
A. Let me take a look at my record.
Q. I think he was in the military for about three months.
A. Yes, something happened to him during basic that he couldn't finish, as I recall.
Q. So we wouldn't contribute military exposure, correct?
A. That is correct.
Q. What about age? Would age do that to your hearing?
A. No.
Q. Now, physical exam. Anything physically presented?
A. The big thing in the physical exam is his tuning forks corroborated his audiogram, meaning that he had a significant loss on that right side, or essentially a profound level on that right side versus still having pretty good hearing at the lowest frequencies, but high frequency, big problem.
Q. Now, what about nonoccupational sources, like mowing his lawn?
A. He had some minor nonoccupational sources of noise but I didn't see a significant nonoccupational trigger.
Q. Now, would you consider somebody that mowed their lawn, not professionally but recreationally, as a major factor in contributing to somebody's hearing loss?
A. You know, certainly anything is possible, but no, that is not a significant contributing risk factor to significant hearing loss.
Q. Well, why don't you give the Judge your opinion as to Mr. Phillips' hearing loss.
A. He has an asymmetric hearing loss, meaning that the right side is out all together, for all sakes and purposes, and he has a left sided hearing loss. And so then we've got to look at that left sided loss, how it appears, what his history was, where he did temporary threshold shifts, and could noise have been the most important factor, or were there other things like age and other occupations. And it looks to me that that amount of occupational noise, I think is the most likely contributor. And what happened to that other side? Well, we see this all the time in the office. And as much as doctors love to give fancy names to things, our name for this diagnosis, the way it happened to him is terribly uncreative. We call it sudden sensorineural hearing loss. And that is what this fellow described. One day he started hearing a buzzing in the ear, and the next hearing test shows that there was nothing going on on that side. We think it's from a virus that attacks one's inner ear. We are not sure. And maybe a circulation affect or something like that.
THE COURT:
Are you telling me, then, that your diagnosis of hearing loss related to the occupational exposures are primarily limited to the left side?
A. In this man, that is right.
THE COURT:
Because the other you contributed to potentially a sudden viral syndrome or other syndrome.
A. And the other one is atypical for how occupational noise behaves. So I am not blaming the right side on occupational noise.
[20] The trial court also found that this "gradual and insidious" nature of occupational hearing loss was "the very characteristic that distinguishes hearing loss resulting from an "accident" as covered by the Louisiana Work[ers'] Compensation Act...."
[21] The court factually distinguished Sellers v. Lykes Bros. Steamship Co., Inc., 94-1107 (La. App. 4 Cir. 12/28/94), 648 So.2d 496, wherein an employee claimed not to learn of his hearing loss until approximately twenty years after his last exposure.
[22] The trial court also quoted the following language from Broussard:

For Defendant now to argue that Broussard was sufficiently aware in 1986 or 1988 of the consequences of the accumulated effects of the work environment on his hearing, after testing and telling Broussard in 1988 or 1990 that his hearing was satisfactory, is disingenuous.
Broussard, 29,769, p. 3, 700 So.2d at 545 (emphasis supplied by trial court).
[23] dB is an abbreviation for decibel; dBA is an abbreviation for average daily exposure to a decibel level.
[24] The trial court cited Occupational Noise Exposure, Hearing Conservation Amendments Level, 46 Fed.Reg. 4078, 4087-96(1981), as evidence for the proposition that "there is an abundance of epidemiological and laboratory evidence that protracted noise exposure above 90dB causes hearing loss in a substantial portion of the exposed population."
[25] The court cited Conner v. Naylor Industrial Services, 579 So.2d 1226 (La.App. 3d Cir. 1991) and Sayrie v. Harbert International, Inc., 576 So.2d 1127 (La.App. 3d Cir.1991).
[26] Plaintiffs Phillips, Barcia and DiCarlo suffered the greatest amount of hearing loss of the five Plaintiffs.
[27] Dr. Driscoll testified at trial that he did not visit the Murphy refinery:

Q. As a matter of fact, you have never visited Murphy Oil's refinery and inspected it, [have] you?
A. That's correct.
[28] Dr. Driscoll also conceded at trial that the Tenneco measurements Murphy attempted to introduce were dissimilar because pipefitters were separated from welders at Tenneco:

Q. Mr. Driscoll, the November 29, 1983, that is Tenneco data, correct?
A. Yes, it is.
Q. This was produced in a lawsuit, Lawrence Billiot versus Epic Oil?
A. That is correct.
Q. How much more hearing data was produced besides this little piece of paper here?
A. I don't know, I didn't deal with the audiometric data.
Q. Didn't you get two boxes of material with sound data in it supplied to you from Tenneco, two boxes like the box I am holding in my hand?
A. I thought you said hearing data, which I interpret as audiograms.
Q. Sound data.
A. Yes, I got boxes.
Q. Boxes of it.
A. Yes, two boxes.
Q. And this is the only thing that came out of it, two boxes?
A. Well, it was the only thing that applied to pipefitters.
Q. Pipefitters.
THE COURT:
The question was pipefitters, insulators and welders, wasn't it?
Q. Yes. And the other thing is, at Murphy, you are familiar that Murphy has a pipefitter welder, is that correct?
A. Yes.
Q. And at Tenneco they are separated, correct?
A. Yes, they are.
[29] For a meaningful discussion regarding permanent hearing loss caused by occupational noise exposure, see M. Elizabeth Medaglia and H. Bryan Brewer III, New Trends in Long-Tail Torts: Occupational Noise-Induced Hearing Loss and Lead Exposure, 26 Brief 11, at 11-20 (Spring 1997).
[30] Emphasis supplied.
[31] Emphasis supplied.
[32] Emphasis supplied.
[33] The January 2000 report also read:

The results of the noise measurements are shown in Appendix 2. The OSHA action level for employee exposure to noise is 85 dBA as an 8-hour, time-weighted average (TWA)(50 percent daily noise dose) while the OSHA maximum permissible level without hearing protection is 90 dBA, also as an 8-hour TWA (100 percent daily noise dose). The 12-hour time-weighted average standards are 82 dBA and 87 dBA, respectively. Location 4 exceeded the 87 dBA level while locations 2, 3, and 7 either equaled or exceeded the 12-hour action level of 82 dBA.
[34] The measurement period ranged from 318 minutes to 386 minutes.
[35] See also the discussion supra of the trial court's factual findings with respect to each individual Plaintiff.
[36] Even Murphy's expert, Dr. Driscoll, testified that he agreed 85 dBA is a better threshold for worker safety:

THE COURT: Do you believe that the 85 [dBA] is a better threshold [than 90 dBA] for the safety and health of the workers' ear[s]?
A. Yes.
[37] Dr. Roeser testified with regard to Mr. Barcia:

A. I will review each of the areas. He was in the Air Force, he was a Staff Sergeant, he was there for 15 years as a butcher. I would not consider that to be [a] significant [contributing factor].
THE COURT: Okay.
A. He does have a medical history of having a pacemaker, he has prostate cancer, he had eye surgery. I wouldn't consider that to be a significant factor.
THE COURT: Okay.
A. His hobbies are playing the harmonica and singing in the church choir. I wouldn't consider that a factor. So I am looking at all those other factors. I considered them but I didn't consider them as substantial contributing factors.
THE COURT: Okay. The substantial contributing factor to his hearing loss was the noise-induced exposure [at Murphy]?
A. Exactly. [Emphasis added]
Dr. Roeser testified with regard to Mr. Baudean:
Q. And in your opinion, does Mr. Baudean have a high frequency sensorineural hearing loss that is a result of his noise exposure at Murphy Oil?
A. Yes. [Emphasis added.]
Dr. Roeser testified with regard to his opinion regarding Mr. Becker:
Q. Now, in looking at all the audiograms in total and all of the evidence that you have reviewed as to Mr. Becker, what is your opinion as to his hearing loss?
A. That Mr. Becker's high frequency sensorineural hearing loss, that working at Murphy Oil was a substantial contributing factor to Mr. Becker's high frequency sensorineural hearing loss. [Emphasis added]
Dr. Roeser testified similarly with regard to Mr. DiCarlo:
Q. Now, you have reviewed the sound level surveys out at Murphy Oil and other documentation. Do you have an opinion as to the cause of Mr. DiCarlo's hearing loss?
A. I do.
Q. And what is that?
A. Working at Murphy Oil was a substantial contributing factor for this hearing loss. [Emphasis added]
Dr. Roeser reached the same conclusion with regard to Mr. Phillips:
Q. Now, do you have an opinion as to the cause of Mr. Phillips' hearing loss?
A. I do.
Q. And what is that opinion?
A. That his left ear, that working at Murphy Oil was a substantial contributing factor to his hearing loss, specifically in his left ear, which we can see, and in his right ear, which is more difficult to factor out because of the nature, the degree of loss in his right ear. But certainly it had an [e]ffect. It was a substantial contributing factor.
[38] The NIOSH document indicates that "[o]ccupational noise exposure shall be controlled so that no worker shall be exposed in excess of the limit described as line B in Figure I-1." Line B of the referenced diagram correlates with 85 dBA for a "permitted duration" of over eight hours.
[39] The 2006 American Conference of Governmental Industrial Hygiene document reads, in pertinent part:

In 1974, the U.S. Environmental Protection Agency (EPA) published the "Levels" document. In this document, an 8-hour level of 75 dBA was established as the level that would protect "public health and welfare with an adequate margin of safety."
(footnotes and citation omitted).
[40] The 2008 document reads, in pertinent part:

The current OSHA scheme, with an Action Level for hearing conservation at 85 dBA and the PEL [permissible exposure limit] for noise at 90 dBA, allows employees with exposures between 85 and 90 dBA who have not experienced a Standard Threshold Shift (STS) the option of not wearing hearing protection. This sends the wrong message to employers, namely: "exposures between 85 and 90 dBA are not very hazardous so there is no need for mandatory hearing protection and noise controls." In fact, there is evidence to suggest that the rate of hearing loss among workers with exposures in the 80-90 dBA range is greater than among workers with exposures between 90 and 95 dBA. (citation omitted).
[41] Mr. Rose testified that industrial hygienists generally have a five-step approach of evaluating employee noise exposure: first, recognize the problem of occupational noise exposure; second, evaluate the problem; third, if high noise exposure levels are present, make sure control measures are in place; fourth, conduct audiograms and train employees with regard to hearing protection; and fifth, audit and evaluate the hearing conservation program to confirm that supervisors and employees are following the guidelines.
[42] The trial court acknowledged Murphy's criticism of Dr. Arriaga's finding of a temporary threshold shift caused by bruising in the inner ear in Plaintiffs Barcia, Baudean and Gilmore, based upon their complaints of a ringing or clogged feeling at the conclusion of their shift. Noting that OSHA regulations define a standard threshold shift as a change in hearing relative to a baseline audiogram of an average of 10db or more in the 2000 to 4000 range of frequency in either ear, the court also recognized that OSHA regulations allow an adjustment for presbycusis, or aging, in a standard threshold shift. Considering all of the evidence presented at trial, the trial court concluded that Dr. Arriaga's expert opinion was simply more credible (emphasis added):

Irrespective of the nomenclature and questions of frequency and duration, and considering the lack of data regarding duration and frequency which would may [sic] attribute some or all of the temporary shift to presbycusis, Dr. Arriaga, within his medical expertise, could opine that such a condition bruises the inner ear and the more it occurs, the more bruising occurs, contributing to hearing loss. The diagnosis is valid although derived from clinical (including patient history) findings in light of the tack of date of frequency and duration. The lack of documentation does not discredit Dr. Arriaga's opinion, only showing that a more complete analysis and potential attribution to the aging process could be more accurately [] made if the data were available. Murphy's expert did not venture to make a diagnosis of the causation of Plaintiffs['] cause of hearing loss from the exposure and medical records in [the] absence of a physical examination. Therefore, Defendants have presented no alternative diagnosis, save and except interpretation of epidemiological data and statistical probabilities.
Murphy's expert, Dr. Dobie, relied on the estimate of another Murphy expert, [Dr.] Driscoll[,] that that Plaintiffs were exposed to sound levels below 90 dBA in reaching his conclusion [that] the noise exposure at Murphy "was not a substantial factor in Plaintiffs hearing loss" since it did not cause an audiometrically measurable component of their hearing loss. Murphy's expert audiologist, David Lipscomb[,] earlier testified that without serial audiograms, it is impossible to determine whether noise or aging caused a hearing loss. Yet, it is Murphy's duty and responsibility under the OSHA regulations to provide for those serial audiograms. A duty to its employees that Murphy breached.
The trial court also found the testimony of Plaintiffs' expert witness, Dr. Ross Roeser, credible with regard to causation of Plaintiffs' hearing loss:
Where potential alternative contribution of cause [of hearing loss] is considered, such as smoking, diabetes, hunting occasionally, cutting grass or treatment by chemotherapy under the same conditions and those potential causes are ruled out because of the timing of those events, as possible explanations of Plaintiffs hearing loss. This differential diagnosis [by] Plaintiffs expert, Dr. Roeser, is the only acceptable medical science. [Keener] v[]. Mid-Continent[] Cas.[,] [01-1357 (La.App. 5 Cir. 4/30/02),] 817 So.2d 347. To this writer, such a differential diagnosis is also an exercise in "common sense."
[43] Likewise, we do not find that the trial court's determinations with respect to attributing credibility to Plaintiffs' experts constituted an abuse of its vast discretion. See, e.g., Louisiana State Bar Ass'n v. Carr & Associates, Inc., 2008-2114, p. 17 (La.App. 1 Cir. 5/8/09), 15 So.3d 158, 171, writ denied, 2009-1627 (La. 10/30/09), 21 So.3d 292.
[44] The current provision regarding the definition of "accident" reads as follows:

"Accident" means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
La. R.S. 23:1021(1).
A Louisiana treatise discussed the post-1989 amendments to the definition of "accident":
An event which results in injury or death cannot be classified under the statute as an "accident" unless it happens "suddenly or violently." This is part of the definition of the word "accident" set forth in La. R.S. 23:1021. It is likely that this portion of the definition was on the one hand a reflection of the kinds of incidents most common at the time the legislation was first enacted (and therefore the evil at which the Act was directed), and on the other hand an effort to avoid difficult problems of proof of causal connection between the incident and the disability. It is certainly not unexpected to find that as the nature of disabling industrial incidents has changed, and as the ability to prove causal connection has improved, these terms have been used less and less as grounds upon which to deny compensation. However, the addition to the definition in 1989 of the further qualification that the injury must be an "actual, identifiable, precipitous" event "directly" producing findings of an injury and "more than simply a gradual deterioration or progressive degeneration" may have been intended to bolster the concepts of "violence" and "suddenness" and thus may have been an attempt to reverse the jurisprudential tendency to discount these concepts.
13 La. Civ. L. Treatise, Workers' Compensation Law and Practice § 214 (5th ed.)(footnotes and citations omitted)(emphasis added). In this regard, we explicitly disagree with Murphy's argument that the changed definition somehow "compels the conclusion" that the pre-1989 definition included occupational noise-induced hearing loss.
[45] Dr. Roeser also testified at trial regarding the delay between the occupational noise exposure and the resulting hearing loss:

Q. Now, does a person who is experiencing noise-induced hearing toss, is that something that they are keenly aware of?
A. That is the unfortunate thing because the frequencies that are initially affected are above the frequencies that we use for hearing and understanding speech. Certainly, the frequencies in the range of above 3,000 are part of understanding speech. But the typical individual who has a noise-induced hearing loss will have repeated exposure. It will take, depending on the amount of time and the energy that is involved, it will take a considerable amount of time before that individual has any indication that there is a problem. . . .
[46] Likewise, we find Murphy's reliance upon a case involving arthritis is misplaced. In Gales v. Great Atlantic & Pacific Tea Co., 342 So.2d 241 (La.App. 4th Cir. 1977), the court found that the employee's "pre-existing arthritic condition" was worsened by the exposure to varying temperatures in the workplace.
[47] The Chatelain court found that the employee did not meet his burden of causation:

Three doctors were called as experts by the parties, and all three testified that acoustical trauma, such as that alleged by the plaintiff, usually causes bilateral damage, that is, there is usually a near equal loss of hearing in both ears. The experts also agreed that a unilateral loss of hearing is usually caused by viral neuronitis, or viral infection. Such an infection can be the result of common diseases such as a cold or the mumps. Dr. Miles Lewis, a specialist in the field of Otology opined that as many as sixty-seven percent of the cases of unilateral loss of hearing are caused by the common cold. Plaintiff's expert witness, Dr. Frank Norman, a specialist in Otolaryngology conceded that in the case of unilateral deafness, he would suspect other causes first before he would suspect industrial noise as the cause of unilateral deafness.
The medical testimony shows that due to the nature of the loss of hearing suffered by the plaintiff, that is, unilateral, there is only a possibility of a causative accident. The testimony as a whole does not show it more probable than not that an industrial accident occurred nor that it had a causal relation to the disability. Accordingly, we must find that the plaintiff has not met his burden of proof and that the judgment of the trial court should be affirmed.
Chatelain v. American Can Co., 344 So.2d 1180, 1182 (La.App. 4th Cir. 1977). Chatelain v. American Can Co., 387 So.2d 670 (La.App. 4th Cir. 1980) simply affirmed the trial court's finding that the employee's claims under workers' compensation failed in Chatelain, supra, 344 So.2d 1180, because the employee did not prove that his hearing loss was caused by his work environment.
[48] This court finds Murphy's reliance upon Burrows v. Arizola Petroleum Co., 7 La.App. 704 (La.App. 2d Cir. 1928) is also misplaced, as the employee in Burrows experienced hearing impairment caused by a boiler explosion.
[49] The facts of the accident were detailed by the court as follows:

Plaintiff was employed by defendant for approximately four years preceding the date of the accident and had, on many occasions, been required to assist in `shooting the kilns'. On the date of the alleged `accident', namely, July 28, 1960. after having been engaged in shooting the kilns for a period of two or three hours, plaintiff and two fellow workers, Burton Dufour and Burton J. Pritchard, began to shoot the Number Five or last kiln. For some reason (not appearing in the record) Number Five kiln was shot without reducing the temperature therein, consequently, the intensity of the noise produced by each shell fired into said kiln was somewhat louder than usual. Plaintiff, who was acting as loader, inasmuch as he was inserting shells into the gun, testified that the noise was such that he had placed rags over the sides of his head to protect his ears. He suddenly felt what he described as `an excess stunned blow' in his ear of greater intensity than ordinarily occasioned by the shooting. The extreme loudness of the reports caused plaintiff to experience a stunned feeling accompanied by an aching in his ears which affected him to the extent that he jumped away from the kiln two or three times.
Comoletti, 147 So.2d at 714.
[50] Murphy's expert in audiology testified that, absent acoustical incidents and explosions, he was not aware of any employee with noise-induced hearing loss whose hearing loss was covered by Louisiana workers' compensation:

Q. In the 40 years and 250,000 audiograms, have you ever made the conclusion, come to the conclusion, first, somebody had noise-induced hearing loss; second, that the noise-induced hearing loss was from their workplace exposure, and then certify it as a workers' comp claim?
A. Yes.
Q. If we remove acoustical incidents, what's your answer?
A. Yes.
Q. Long term noise-induced hearing loss you found was workmens' comp, right?
A. Frequently.
Q. In Louisiana?
A. Not under Louisiana workers' comp, of course, but I work in Louisiana and I evaluate lots of claims under the Longshore Act.
A. Okay. Let's eliminate the Longshore Act, let's eliminate the explosions and the acoustical incidents. Now out of the 250,000 thousand, how many people have you concluded have noise-induced hearing loss from workplace exposure that were covered by Louisiana State Workers' Comp?
A. I don't believe any of the claims come under state workers' comp.
Q. In your deposition you told me "none." That is correct, isn't it?
A. Yes.
[51] The Louisiana Supreme Court has set forth four sets of circumstances under which the doctrine of contra non valentem is applicable:

(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiffs action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or (4) where the cause of action is neither known nor reasonably knowable by the plaintiff even though plaintiff's ignorance is not induced by the defendant.
Renfroe v. State ex rel. Dept. of Transp. & Dev., 2001-1646, p. 9 (La.2/26/02), 809 So.2d 947, 953. At issue under these particular facts and circumstances is the fourth category.
[52] The Plaintiffs claimed that "Exxon knowingly disposed of oilfield wastes in unlined earthen pits and/or released the waste directly into waterways, resulting in contamination to their property" and that "the oilfield wastes deposited into these pits and water bodies contained naturally occurring radioactive material ("NORM"), produced water, drilling fluids, chlorides, hydrocarbons, heavy metals and other toxic substances." Marin, p. 5, 48 So.3d at 241.
[53] Plaintiff Clyde Breaux also signed a release on September 4, 1991, after the remediation efforts by Exxon:

At about the same time, in 1986, the Louisiana Department of Natural Resources ("DNR") amended Statewide Order 29-B to require the registration and closure of existing unlined oilfield pits. The amended regulations also required that various enumerated contaminants in the soil be remediated to certain standards. Between 1987 and 1991, Exxon closed all of the remaining pits on the Breaux and Marin properties and represented that it was remediating the pit areas to Statewide Order 29-B standards. During the pit closure process, Breaux routinely communicated with Exxon employees regarding the remediation work. The last efforts to remediate the pits occurred in 1991. On September 4, 1991, Exxon instructed Breaux that in order to have his land returned to him for farming, he would have to sign a release, which he did. Thereafter, on May 18, 1994, the Marin plaintiff's and Exxon entered into a Lease and Novation Agreement that superseded the 1941 Surface Lease. This agreement was amended in December, 1997 and April, 2001. In conjunction with these amendments and leases, Exxon compensated the plaintiffs for sugarcane loss. Although production on the properties began to dwindle in the 1980s, the Marin Lease and the Surface Lease as amended and novated remained in effect at the time suit was filed.
Marin, p. 4, 48 So.3d at 240. The Court noted that both lower courts found that the 1991 release did not constitute a compromise of plaintiffs' claims, and the finding was not assigned as error. Marin, p. 17, 48 So.3d at n. 13.
[54] Harvey involved an allegation of an accountant's negligence in income tax preparation.
[55] Murphy also relies upon Albritton v. International Minerals & Chemical Corp., 06-0774 (W.D.La.10/25/07), 2007 WL 3119282 at *4 (unpub.), wherein the court found that the plaintiffs' hearing loss claims had prescribed, stating that the plaintiffs proved "only that they were unaware of the cause of the hearing loss, not that they were unaware of the hearing loss itself." We find Murphy's reliance on this unpublished opinion unpersuasive. Furthermore, the plaintiffs did not controvert the evidence supporting summary judgment. Id. In determining whether contra non valentem is applicable, "[t]he ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." Campo, 2001-2707, p. 12, 828 So.2d at 511 (emphasis in original).
[56] Murphy relies upon Hymel v. Eagle, Inc., 2008-1287 (La.App. 4 Cir. 3/18/09), 7 So.3d 1249, wherein a plaintiff claimed he had not read or understood the terms of a settlement agreement.
[57] The Court noted that the plaintiff was not chargeable with the knowledge that he had asbestosis until he was diagnosed:

Based upon the totality of the circumstances, we find that Mr. Robertson was never diagnosed with asbestosis by any physician until he met with Dr. Van Campen in late 1985 or early 1986. In August of 1983, after being examined by Dr. Kaimal, Mr. Robertson was told by Dr. Camp that the findings on his chest x-ray could be the result of several causes besides asbestosis. From 1983 until 1985, Mr. Robertson was told by Dr. Camp during his annual examinations that his chest x-rays remained essentially unchanged. Mr. Robertson never saw his medical record until late 1985 or early 1986. Even if he had, we conclude that there was no diagnosis of asbestosis in his medical record. Mr. Robertson relied upon what was told to him by Dr. Camp as well as his own subjective state of health which was that he never had any ill effects or symptoms related to asbestosis. The company monitored him and several other employees in the Asbestos Survey Program commencing in 1979 but never considered that any treatment related to the findings on his chest x-rays was necessary.
In sum, we conclude that Mr. Robertson cannot be chargeable with knowledge that he had asbestosis until late 1985 or early 1986. Hence, his delay in filing suit was reasonable and his cause of action against defendants has not prescribed.
Cole, 620 So.2d at 1157-58 (emphasis added).
[58] The court recognized that the prescriptive period did not begin to run until the diagnosis of mesothelioma was certain:

Dr. Lipka [plaintiff's] remarked that there was a question from a histologic standpoint about whether Mr. Hughes had mesothelioma even with the symptoms presented by Mr. Hughes in April and May, but the disease's later progression established that the diagnosis of mesothelioma was correct. A review of Mr. Hughes' medical history in April and May of 2000 shows that the diagnosis for Mr. Hughes went from probable cancer that was strongly suspected to be mesothelioma, to adenocarcinoma, to a final diagnosis of mesothelioma. . . . Under such circumstances, it was not unreasonable for Mr. Hughes to delay bringing suit until May 4, 2001, which was within one year from June 9, 2000, the date on which he learned that he had mesothelioma. Accordingly, the trial court was clearly wrong in granting Olin's exception of prescription.
Hughes v. Olin Corp., 37,404, p. 9 (La.App. 2 Cir. 10/3/03), 856 So.2d 222, 228.
[59] Mr. Phillips testified as follows:

Q. Now, were you given hearing protection when you went to work in 1974?
A. No.
Q. Was it discussed with you, hearing protection?
A. No.
[60] Mr. Baudean testified that he did not recall hearing protection being discussed while he worked at Murphy:

Q. Let me ask you this question. If [hearing protection] had been required in 1967, would you have worn it?
A. Yes, sure. Hey, I do what I got to do to keep my job. And if it's a requirement, I'm going to do it.
Q. All right. Did anyone, in the time you worked from '67 to '98, tell you that if you don't put this plug in your ear, you are going to lose your hearing permanently?
A. No.
Q. If someone had told you that, would you have been looking for hearing protection?
A. Yes.
Q. While you were at Murphy, did you realize you were losing your hearing?
A. No.
[61] Mr. Becker testified in his deposition that he did not recall hearing protection being discussed until the 1990s, and that hearing protection was never mandatory at Murphy:

Q. Okay. When do you believe thatfrom 1961 to 1996 when you retired, when do you believe that hearing protection was a subject that was discussed by Murphy with the workers?
A. Hardly ever. But I would say in the lastmaybe in the last four to five years that it was really discussed. But it wasn't something that wasthey pushed it or mandatory, [sic] you know, that I can remember.
* * * *
Q. Do you ever remember a Murphy supervisor stopping a job and telling somebody, either you or you observed them tell someone else to stop the job and go get hearing protection?
A. Never, never. All of us were involved in getting out the fire or stopping a leak, whatever.
[62] Mr. DiCarlo, although he had difficulty recalling dates and time frames, similarly testified that no instructions or signs warning of loud noise were ever provided with regard to hearing protection:

Q. No, you said 1974. What happened in '74?
A. I think hearing plugs came into play.
Q. All right. They were made available to you?
A. Yes, either maybe in '74 or a little bit later. That has been so long ago, I can't remember the time.
* * * *
Q. Did they get the men together and instruct them on how to use hearing protection?
A. Not that I am aware of, no.
Q. Did they have a meeting and say what the reason for it was?
A. Not that I can recall.
Q. You retired when?
A. I retired in '93, in August of '93.
Q. Going backwards from '93, when do you remember seeing signs that said there was loud noise in the plant?
A. I can't remember. I don't know.
Q. You don't remember?
A. No, sir.
Q. When do you remember seeing a sign that said, "Hearing Protection Mandatory"?
A. I don't remember seeing signs of that sort.
[63] Mr. Barcia testified at trial that hearing protection was never discussed and was never mandatory:

Q. Now, did you ever wear hearing protection at Murphy?
A. No, I hadn't.
Q. Hearing protection?
A. No.
THE COURT:
You never wore plugs or anything at any time?
A. No, I didn't.
Q. You didn't wear it in the later years?
A. In the later years, like maybe a year before I retired, they had some earplugs in the nurse's office.
* * * *
Q. Did you see other people wearing earplugs in the later years when you worked there?
A. Not really. I might have seen a few couple of them [sic], you know, doing the same thing that I did towards the later years I was there. You know, they had some. As far as them wearing it, I don't know.
Q. Did you see earmuffs? Do you know what an earmuff is?
A. Yes. I never seen any earmuffs.
Q. Did you ever see any signs warning you that the noise was hazardous in the units?
A. There was no sign.
Q. Did you ever see a sign that said, "Hearing Protection Mandatory"?
A. No.
Q. Did anybody from management or safety talk to you about hearing protection?
A. No.
[1] In my view, hearing loss is substantially similar to lead poisoningfor lead accumulates in the body over a long period of time and the effects are gradual and not necessarily known to the injured party.
[2] I read "most probably" to mean more likely than not.
[3] The four possible prongs of the doctrine of contra non valentem are: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or (4) where the cause of action is neither known nor reasonably knowable by the plaintiff even though plaintiffs ignorance is not induced by the defendant. The plaintiffs fall under the fourth category if at all.